**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

N'Daya Lee, individually and as the Administratrix of the Estate of Diane Parker-Reed,

Plaintiff,

-against-

Incorporated Village of Hempstead, County of Nassau, Sgt. Kevin Galvin, Claudia Serrano, Lt. Patrick Cooke, Sgt. John Zoll, Lt. Edward Hayman, P.O. Vito Buccellato, P.O. Christopher N. Cohen, Sgt. Ivory G. Dixon, P.O. Jack Guevrekian, P.O. Edward P. Mulhearn, P.O. Roman Pettway, Jr., P.O. Frane Reado, P.O. Leroy D. Ridley, Det. Donald J. Bittner, Deputy Sheriff John M. Flanagan, John and Jane Does 1-10, and John and Jane Does 11-20,

Defendants.

---

**COMPLAINT**

**Docket No.: 14-CV- 2853**

**Jury Trial is Demanded**

---

Plaintiff N'DAYA LEE ("N'DAYA"), individually and as the administratrix of the estate of DIANE PARKER-REED ("DIANE") (collectively "PLAINTIFF"), by and through her attorneys, LaSasso Law Group PLLC, provide the following complaint and states and alleges as follows upon information and belief:

<strong>PRELIMINARY STATEMENT</strong>

1.      The defendants' willful disregard of the serious and unique risks of domestic violence situations confronting black victims, and the clearly established laws and police procedures enacted to deal with those situations, resulted in increased danger to DIANE and N'DAYA culminating in the brutal murder of DIANE on February 7, 2013.

2.      As a result of the above, PLAINTIFF brings this civil action seeking injunctive and monetary relief, a declaratory judgment, compensatory and punitive damages, disbursements, costs and fees against SGT. KEVIN GALVIN, CLAUDIA SERRANO, LT. PATRICK COOKE, SGT. JOHN ZOLL, LT. EDWARD HAYMAN, P.O. VITO

BUCCELLATO, P.O. CHRISTOPHER N. COHEN, SGT. IVORY G. DIXON, P.O. JACK GUEVREKIAN, P.O. EDWARD P. MULHEARN, P.O. ROMAN PETTWAY, JR., P.O. FRANE READO, P.O. LEROY D. RIDLEY, DET. DONALD J. BITTNER, DEPUTY SHERIFF JOHN M. FLANAGAN, JOHN or JANE DOES 1-10, JOHN or JANE DOES 11-20 (the "INDIVIDUAL DEFENDANTS"), INCORPORATED VILLAGE OF HEMPSTEAD ("VILLAGE"), and COUNTY OF NASSAU ("COUNTY") (collectively the "MUNICIPAL DEFENDANTS") for committing acts under color of law and depriving DIANE and N'DAYA of rights secured by the Constitution and laws of the United States and the State of New York for violations of DIANE and N'DAYA's rights, brought pursuant to federal statute 42 U.S.C. § 1983, and state causes of action for negligence, gross negligence, wrongful death, loss of consortium and parental care, assault, and infliction of emotional distress.

## JURISDICTION AND VENUE

3.      This action arises under the United States Constitution, 42 U.S.C. §§1983, 1988, 2000d and state common law.

4.      Jurisdiction is founded upon 28 U.S.C. §§1331, 1343(a)(3) and (4), and 1367.

5.      PLAINTIFF, invoking the pendent jurisdiction of this Court, also seeks injunctive and monetary relief, both compensatory and punitive, as well as attorney's fees, for negligence, gross negligence, wrongful death, loss of consortium and parental care, assault, and infliction of emotional distress.

6.      Venue is proper in this district under 28 U.S.C. Section 1391, based on the fact that the acts complained of herein occurred in the Eastern District of New York.

2

7.     The Court is respectfully requested to invoke pendent jurisdiction under 28 U.S.C. 1367(a) with respect to PLAINTIFF's claims arising under the laws of the State of New York.

8.     On or about May 3, 2013, and within the 90 days after the cause of action herein arose and more than 30 days prior to the commencement of the action, PLAINTIFF duly presented, served and filed a verified notice of claim with the MUNICIPAL DEFENDANTS pursuant to New York General Municipal Law ("GML") § 50-i, and this action was commenced within one year and 90 days after said cause of action herein accrued.

9.     On December 17, 2013, the MUNICIPAL DEFENDANTS by their respective attorneys, conducted an examination of N'DAYA pursuant to GML § 50-h.

10.     More than thirty days have elapsed since the claim was presented and the MUNICIPAL DEFENDANTS have neglected and refused to make payment of said claim.

11.     Each and all of the acts of the MUNICIPAL DEFENDANTS herein were done by the MUNICIPAL DEFENDANTS, their servants, agents and/or employees under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of New York, VILLAGE, and COUNTY, and under the authority of their offices as officers of VILLAGE, COUNTY, and State of New York.

## **JURY TRIAL DEMAND**

12.     PLAINTIFF hereby demands a trial by jury of all triable issues in this action.

## **PARTIES**

13.     N'DAYA is the daughter and duly appointed administratrix of the estate of deceased plaintiff DIANE.

14.     At the time/date of the filing of the instant complaint, DIANE is deceased.

15.     At the time of the events listed in this complaint, DIANE and N'DAYA resided in the Village of Hempstead, the County of Nassau, and the State of New York.

16.     Defendant VILLAGE was and is a municipal corporation, organized and existing pursuant to the laws of the State of New York.

17.     At all times relevant hereto, VILLAGE operated the Incorporated Village of Hempstead Police Department ("HPD"), and acting through the HPD, was responsible for the policy, practice, supervision, implementation and conduct of all HPD matters and was responsible for the appointment, training, supervision and conduct of all HPD personnel, including the defendants referenced herein.

18.     At all times relevant hereto, VILLAGE was responsible for enforcing the rules of the HPD, and for ensuring that HPD personnel obey the laws of the United States and the State of New York.

19.     At all times relevant hereto, defendant SGT. KEVIN GALVIN ("GALVIN") was a police sergeant employed by the HPD, as the commanding officer of the domestic violence unit, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

20.     At all times relevant hereto, defendant CLAUDIA SERRANO ("SERRANO") was employed by the HPD as domestic violence advocate in the domestic violence unit, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of her employment as such.

21.     At all times relevant hereto, defendant LT. PATRICK COOKE ("COOKE") was a police lieutenant employed by the HPD, as the commanding officer of the outdoor training

facility, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

22.     Upon information and belief, COOKE is responsible for training members of the HPD.

23.     At all times relevant hereto, defendant SGT. JOHN ZOLL ("ZOLL") was a police sergeant employed by the HPD, as the deputy commanding officer of the outdoor training facility, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

24.     Upon information and belief, ZOLL is responsible for training members of the HPD.

25.     At all times relevant hereto, defendant LT. EDWARD HAYMAN, ("HAYMAN") was a police lieutenant employed by the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

26.     At all times relevant hereto, defendant P.O. VITO BUCCELLATO ("BUCCELLATO") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

27.     At all times relevant hereto, defendant P.O. CHRISTOPHER N. COHEN ("COHEN") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

28.     At all times relevant hereto, defendant SGT. IVORY G. DIXON ("DIXON") was a police sergeant employed by the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

29.     At all times relevant hereto, defendant P.O. JACK GUEVREKIAN ("GUEVREKIAN") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

30.     At all times relevant hereto, defendant P.O. EDWARD P. MULHEARN ("MULHEARN") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

31.     At all times relevant hereto, defendant P.O. ROMAN PETTWAY, JR. ("PETTWAY") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

32.     At all times relevant hereto, defendant P.O. FRANE READO ("READO") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

33.     At all times relevant hereto, defendant P.O. LEROY D. RIDLEY ("RIDLEY") was a police officer in the HPD, acting in the capacity of agent, servant and employee of VILLAGE, and within the scope of his employment as such.

34.     At all times relevant hereto, defendants JOHN or JANE DOES 1-10, said names being fictitious and presently unknown, were police officers, detectives, 9-1-1 operators/dispatchers, servants, agents, employees and/or representatives of VILLAGE, and within the scope of their employment as such.

35.     Defendant COUNTY was and is a municipal corporation, organized and existing pursuant to the laws of the State of New York.

36.     At all times relevant hereto, COUNTY operated the Nassau County Police Department ("NCPD"), and acting through the NCPD, was responsible for the policy, practice,

6

supervision, implementation and conduct of all NCPD matters and was responsible for the appointment, training, supervision and conduct of all NCPD personnel, including the defendants referenced herein.

37.     At all times relevant hereto, COUNTY was responsible for enforcing the rules of the NCPD, and for ensuring that NCPD personnel obey the laws of the United States and the State of New York.

38.     At all times relevant hereto, COUNTY operated the Nassau County Sheriff's Department ("NCSD"), and acting through the NCSD, was responsible for the policy, practice, supervision, implementation and conduct of all NCSD matters and was responsible for the appointment, training, supervision and conduct of all NCSD personnel, including the defendants referenced herein.

39.     At all times relevant hereto, COUNTY was responsible for enforcing the rules of the NCSD, and for ensuring that NCSD personnel obey the laws of the United States and the State of New York.

40.     At all times relevant hereto, defendant DET. DONALD J. BITTNER, ("BITTNER") was a detective in the NCPD, acting in the capacity of agent, servant and employee of COUNTY, and within the scope of his employment as such.

41.     At all times relevant hereto, defendant Deputy Sheriff JOHN M. FLANAGAN ("FLANAGAN") was a deputy sheriff in the NCSD, acting in the capacity of agent, servant and employee of COUNTY, and within the scope of his employment as such.

42.     At all times relevant hereto, defendants JOHN or JANE DOES 11-20, said names being fictitious and presently unknown, were police officers, detectives, 9-1-1

operators/dispatchers, supervisors, sheriff's deputies, servants, agents, employees and/or representatives of COUNTY, and within the scope of their employment as such.

43.     Defendants   GALVIN,   SERRANO,   COOKE,   ZOLL,   HAYMAN, BUCCELLATO, COHEN, DIXON, GUEVREKIAN, MULHEARN, PETTWAY, READO, RIDLEY, and JOHN or JANE DOES 1-10 are sued in their individual capacity as well as in their capacity as employees of VILLAGE.

44.     Defendants BITTNER, FLANAGAN, and JOHN or JANE DOES 11-20 are sued in their individual capacity as well as in their capacity as employees of COUNTY.

## DOMESTIC VIOLENCE

45.     The willful disregard by police of the obvious risks of domestic violence situations, and the clearly established laws and procedures enacted to deal with such situations, shocks the conscience.

46.     The serious risks and concerns of a domestic violence situation are well known and well documented.

47.     For more than two decades, the state and federal governments have enacted legislation and policies mandating arrests and other processes in connection with violence against women.

48.     Through the enactment of the Violence Against Women Act of 1994 ("VAWA"), Congress created federal domestic violence crimes, signaled its intent to have states enforce laws against domestic violence, and devoted federal funding for research and training about domestic violence.

49.     Also in 1994, Congress amended the Gun Control Act, to make it unlawful to possess a firearm and/or ammunition while subject to a domestic violence order of protection.

8

50.     In 1996 Congress further amended the Gun Control Act by extending the prohibition on firearms possession to persons convicted of misdemeanor crimes of domestic violence.

51.     Reauthorizations of VAWA as recently as 2013 make clear that the risk of intimate partner homicide and the scourge of domestic violence is well known to the defendants herein.

52.     Indeed, these concerns have long been recognized by the New York State Legislature ("NY Legislature").

53.     Along with VAWA, 1994 also saw the passage by New York State of the Family Protection and Domestic Violence Intervention Act of 1994 ("1994 Act"), which amended the Family Court Act and the Criminal Procedure Law to provide more aggressive law enforcement and criminal justice interventions, and protections for victims of domestic violence, including mandatory arrest laws, orders of protection and training for police.

54.     The 1994 Act recognized the gravity of domestic violence and need for mandatory arrests, declaring that "there are few more prevalent or more serious problems confronting the families and households of New York than domestic violence," "the victims of family offenses must be entitled to the fullest protections of our civil and criminal laws," and "it is necessary to ... provid[e] immediate deterrent action by law enforcement."[1]

55.     The 1994 Act contained provisions enacting a mandatory arrest statute in domestic violence situations.

56.     The 1994 Act's mandatory arrest provisions are codified in New York Criminal

---

[1] In 1999 the NY Legislature enacted the "The Clinic Access and Anti-Stalking Act of 1999", L.1999, ch. 635, which expanded the existing criminal laws and incorporated stalking behaviors not covered under prior statutes.

Procedure Law (N.Y.C.P.L.) §140.10, and mandate that "a police officer <u>shall</u> arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe that" the person *inter alia*: (i) committed a felony against a member of the same family or household; (ii) acted in violation of the "stay away" provision of an order of protection; (iii) committed a family offense in violation of an order of protection; or (iv) committed a misdemeanor constituting a family offense against a family or household member, unless the victim requests otherwise." (emphasis added)

57.     A family offense is defined as "acts which would constitute disorderly conduct, harassment in the first degree, harassment in the second degree, aggravated harassment in the second degree, stalking in the first degree, stalking in the second degree, stalking in the third degree, stalking in the fourth degree, criminal mischief, menacing in the second degree, menacing in the third degree, reckless endangerment, assault in the second degree, assault in the third degree or an attempted assault between spouses or former spouses, or between parent and child or between members of the same family or household[.]" N.Y.C.P.L. 530.11(1); *accord* Family Court Act § 812(1).

58.     N.Y.C.P.L. §140.10(5) requires that upon investigating a report of a crime or offense between members of the same family or household, a law enforcement officer <u>shall</u> prepare and file a written report of the incident, including statements made by the victim and by any witnesses, and make any additional reports required by local law enforcement policy or regulations.

59.     N.Y.C.P.L. §530.11(6) requires a law enforcement officer investigating a family offense to advise the victim of the availability of a shelter or other services in the community, and shall immediately give the victim written notice of the legal rights and remedies available to

a victim of a family offense under the relevant provisions of the Criminal Procedure Law, the Family Court Act and the Domestic Relations Law.

60.     The notice prescribed by N.Y.C.P.L. §530.11(6) reads in part:

> If you are the victim of domestic violence, you may request that the officer assist in providing for your safety and that of your children, including providing information on how to obtain a temporary order of protection. You may also request that the officer assist you in obtaining your essential personal effects and locating and taking you, or assist in making arrangements to take you, and your children to a safe place within such officer's jurisdiction, including but not limited to a domestic violence program, a family member's or a friend's residence, or a similar place of safety.

61.     The purpose of mandatory arrest statutes is to counter police resistance to arrests in domestic violence cases by removing or restricting police officer discretion.

62.     For twenty years, the 1994 Act has required police to treat domestic violence as the serious criminal matter it is, instead of a private issue that did not require government intervention.

63.      N.Y. Exec. Law § 642(5) mandates training for law enforcement:

> Victim assistance education and training, with special consideration to be given to victims of domestic violence, sex offense victims, elderly victims, child victims, and the families of homicide victims, shall be given to persons taking courses at state law enforcement training facilities and by district attorneys so that victims may be promptly, properly and completely assisted.

64.     Statutes mandating training were created to ensure that criminal justice actors, including police, will be informed about the societal and personal costs of domestic violence and how to act to reduce such incidents.

65.     For example, since 2012, the NYS Office for the Prevention of Domestic Violence ("OPDV") has provided online domestic violence training for law enforcement,

accessible to police departments statewide through e-Justice.

66.      §27 of the 1994 Act amends N.Y. Exec. Law § 837 by requiring the Division of

Criminal Justice Services ("DCJS") to work with OPDV to promulgate a standardized

"Domestic Violence Incident Report Form" ("DIR") for use by state and local law enforcement

agencies in the reporting, recording and investigation of all alleged incidents of domestic

violence, regardless of whether an arrest is made as a result of such investigation.

67.      §28 of the 1994 Act amends N.Y. EXEC. Law § 840 to require the Municipal

Police Training Counsel, a part of DCJS responsible for recommending training qualifications

and standards for police, to develop and disseminate written policies and procedures, including

training and education provisions, for the investigation and enforcement of domestic violence

laws.

68.      When the police respond to a domestic incident-related call, N.Y.C.P.L.

§140.10(5) requires them to file a written DIR on the form prescribed by DCJS:

> Upon investigating a report of a crime or offense between
> members of the same family or household as such terms are
> defined in section 530.11 of this chapter and section eight hundred
> twelve of the family court act, a law enforcement officer shall
> prepare and file a written report of the incident, on a form
> promulgated pursuant to section eight hundred thirty-seven of the
> executive law, including statements made by the victim and by
> any witnesses, and make any additional reports required by local
> law enforcement policy or regulations. Such report shall be
> prepared and filed, whether or not an arrest is made as a result of
> the officers' investigation, and shall be retained by the law
> enforcement agency for a period of not less than four years.
> ...

69.      DIRs must be completed and sent to DCJS, which then stores the data in an

electronic repository.

70.     DCJS maintains the repository to allow law enforcement agencies, such as NCPD and HPD, to effectively respond to incidents of domestic violence and to enhance officer and victim safety.

71.     Upon information and belief, despite increases in the reported incidents of domestic violence in the years before DIANE's death, COUNTY and VILLAGE willfully disregarded and continue to disregard their obligations to file DIRs and make mandatory arrests.

72.     According to DCJS Uniform Crime Reporting System, in 2009, there were 1451 "victims" of domestic violence reported by the NCPD of which 538 of the reports were based on violations of orders of protections.

73.     In 2010, NCPD reported 1,461 domestic violence "victims" to DCJS of which 551 were based on violations of orders of protection.

74.     In 2011, NCPD reported 1,067 domestic violence "victims" to DCJS of which 474 were based on violations of orders of protection.

75.     In 2012, NCPD reported 1,514 domestic violence "victims" to DCJS of which 361 were based on violations of orders of protection.

76.     In 2009, HPD reported 107 domestic violence "victims" to DCJS of which 51 were based on violations of orders of protection.

77.     In 2010, HPD reported 209 domestic violence "victims" to DCJS of which 73 were based on violations of orders of protection.

78.     In 2011, HPD reported 246 domestic violence "victims" to DCJS of which 69 were based on violations of orders of protection.

79.     In 2012, HPD reported 276 domestic violence "victims" to DCJS of which 92 were based on violations of orders of protection.

80.     Repeated violations of orders of protection are an indication both that violence is increasing, potentially to lethal state, and that it is being committed by a person with little respect for the rule of law.

81.     Women threatened or assaulted with a gun or other weapon are significantly more likely to be murdered by an intimate partner.

82.     Past threats of murder increases the likelihood of an abused woman being murdered.

83.     Having a gun in the home increases the likelihood of an abused woman being murdered.

84.     Victims of intimate partner homicide are likely to have had contact with criminal justice, victim assistance, and/or health agencies.

85.     Failure to enforce orders of protection increases the risk of batterer recidivism.

86.     Black victims of domestic violence are more likely than other victims of domestic violence to be murdered.

87.     COUNTY has a task force on domestic violence: "comprised of representatives of public and private agencies and organizations, working together to reduce the incidence of all forms of family violence ... to address the increasing incidence of family violence in Nassau County."

88.     NCPD has a Domestic Affairs Liaison, a position devoted to establishing procedures for:

> 1. protecting victims of domestic violence and providing them with support through a combination of law enforcement and community services;
>
> 2. preventing the cycle of domestic violence and abuse;

3. responding to domestic incidents;

4. promoting officer safety and effectiveness by ensuring that officers are properly prepared to deal with domestic incidents.

89.     Upon information and belief, at all times relevant herein the NCPD's stated policy on domestic violence was and is:

> ...to afford the victims of domestic violence the greatest protection available. Our policy is intended to protect victims, enforce laws, and prevent future violence. Arrests are made when there is reasonable cause to believe that offenses have been committed or orders of protection have been violated. Reasonable cause is determined in the same way it is for all other offenses; the determination of reasonable cause is not influenced by the domestic relationships of the participants involved. Domestic incidents are not mediated in lieu of court proceedings.

90.     HPD also has a domestic violence unit, which is responsible for education, prevention and enforcement in domestic violence cases.

91.     COUNTY and VILLAGE share responsibility for policing domestic violence in the Village of Hempstead.

92.     VILLAGE pays COUNTY a headquarters tax for the provision of certain services from the NCPD including use of the police academy, fingerprint services, detectives division, and specialized units such as a hostage negotiation team, BSO units, emergency services units, and the emergency ambulance bureau.

93.     The result of this arrangement is shared responsibility for policing the Village of Hempstead.

94.     NCPD and HPD also share training resources and procedures.

95.     NCPD and HPD both received reports of and/or witnessed domestic abuse of DIANE and N'DAYA by REED; MUNICIPAL DEFENDANTS were on notice of the imminent threat REED presented.

96.     The perpetuation of NCPD and HPD's broken system of divided responsibility and failure to carry out the basic duties of law enforcement results in a lack of accountability that demonstrates deliberate indifference to the rights of victims of domestic violence living in the Village of Hempstead.

97.     As of early 2009, the VILLAGE and COUNTY and their respective police forces were on notice of the dire consequences stemming from the improper handling of domestic violence situations, especially as to black women.

98.     In March 2009, in Nassau County, Jo'Anna Bird ("Bird") was murdered by her child's father who had violated orders of protection over the course of two years, while NCPD officers ignored her and her family's pleas for help.

99.     In March 2010, the Estate of Jo'Anna Bird filed a complaint alleging claims pursuant to §1983 for violations of Bird's civil rights and state causes of action for negligence, gross negligence, abuse of process, wrongful death, assault, battery, and false imprisonment, loss of consortium and parental care, negligent infliction of emotional distress, intentional infliction of emotional distress, and *prima-facie* tort violations ("Bird Complaint").

100.    The Bird Complaint alleges, *inter alia*, that prior to Bird's murder, between 2008 and 2009, the COUNTY failed to arrest her abuser on at least seven occasions in which he violated her order of protection.

101.    On January 30, 2012, the Nassau County Legislature approved the issuance of a bond to pay a multi-million dollar settlement to the Estate of Jo'Anna Bird, signaling to law enforcement throughout Nassau County that these type of failures could not be tolerated.

102.    Former NCPD Commissioner Lawrence Mulvey admitted that COUNTY officers disregarded procedures and barely took any notes when called to the Bird family home in the

days prior to her killing. Commissioner Mulvey further stated that "I wish we had provided better service to the family on the 15th and 17th [of March of 2009]. In that sense we failed."

103.     The brutal murder of Jo'Anna Bird is indicative of the MUNICIPAL DEFENDANTS' custom, policy and practice of willful disregard of the obvious risks of domestic violence situations and underscored the need for a zero-tolerance policy with abusers.

104.     It further signals the MUNICIPAL DEFENDANTS' deliberate indifference to the tragic consequences of their custom, policy and practice of providing less protection to black victims of domestic violence.

105.     The HPD has a culture of racial insensitivity and discrimination, especially as to domestic violence matters.

106.     Upon information and belief, on November 6, 2008, the day after Barack Obama was elected President of the United States, Caucasian HPD officers made jokes about who would take the DIR at the White House.

107.     A federal jury found the VILLAGE liable for the removal of black female HPD officer Sherry Hines as supervisor of the domestic violence unit following her complaints of race and gender discrimination by the HPD.

### FACTUAL ALLEGATIONS

108.     Pursuant to the their fatally flawed and racially motivated customs, policies and practices, from 2011 through early 2013, the MUNICIPAL DEFENDANTS willfully disregarded the escalating threat posed by REED, emboldening him to commit further acts of domestic violence against DIANE and N'DAYA, and culminating in DIANE's death.

109.     DIANE, a black female, was born in the Village of Hempstead on October 18, 1970.

110.    REED, a black male, was born in the Village of Hempstead on August 28, 1967.

111.    DIANE and REED grew up in the Village of Hempstead, attended Hempstead High School, and lived in the Village for most of their lives.

112.    Many HPD officers grew up in the Village of Hempstead, attended Hempstead High School, or have lived in the Village for most of their lives.

113.    The Village of Hempstead is 3.7 square miles.

114.    Prior to her death, DIANE had personal relationships with members of the HPD.

115.    Upon information and belief, REED also had personal relationships with members of the HPD.

116.    Upon information and belief, members of the HPD referred to REED as "Len" or "Lenny."

117.     On December 23, 1994, DIANE gave birth to her only child N'DAYA, a black female.

118.    At all times relevant hereto, N'DAYA had personal relationships with members of the HPD.

119.    DIANE and REED began dating during 2007.

120.    DIANE and REED were married in August 2010.

121.    From 2008 to November 2012, DIANE, REED and N'DAYA resided together at 25 Roosevelt Street, Village of Hempstead, County of Nassau, State of New York ("25 ROOSEVELT").

122.    Non-party Shetia Preston ("SHETIA") began living with them at 25 ROOSEVELT in September 2009.

123.    25 ROOSEVELT is a single family, free-standing house with a first floor, finished basement, and violent history.

124.    Two HPD officers lived just a few doors down from 25 ROOSEVELT.

125.    REED was known to carry a gun and spoke about it freely, often bragging about his "nine," referring to his unregistered 9 mm Ruger P89 handgun.

126.    REED was a known drug-dealer, and sold marijuana from two notorious drug locations on S. Franklin Street in the Village of Hempstead.

127.    REED is a convicted felon with an extensive criminal history.

128.    Prior to murdering DIANE, REED had been arrested numerous times by the HPD and NCPD.

129.    REED was incarcerated on drug charges from 1993 to 1998, and was on parole from 1998 to 2000.

130.    From 2008 to February 7, 2013, REED's domestic violence against DIANE and N'DAYA was continuous and steadily escalated, a common trend in intimate partner violence.

131.    DIANE and N'DAYA spoke regularly with members of the HPD about the abuse.

132.    Leading up to February 7, 2013, MUNICIPAL DEFENDANTS were aware REED posed an imminent threat to DIANE and N'DAYA's safety.

133.    In addition to DIANE and N'DAYA's constant communication with members of the HPD, MUNICIPAL DEFENDANTS responded to 25 ROOSEVELT on numerous occasions.

134.    By way of example, in or about 2010, officers from the HPD or NCPD responded to 25 ROOSEVELT after REED assaulted DIANE, knocking her unconscious.

135.    DIANE and N'DAYA told the officers about the assault, that REED was very violent, and that the abuse happened all of the time.

136.    Upon information and belief, the officers failed to file a DIR or arrest REED allowing the violence to continue.

137.    The lack of police response emboldened REED and encouraged his relentless reign of terror.

138.    In April 2011, REED beat and pistol-whipped DIANE with his 9mm Ruger P89— the same gun he used to murder DIANE two years later.

139.    DIANE was treated at Nassau University Medical Center for her injuries and the incident was reported to the HPD.

140.    An HPD officer responded to Nassau University Medical Center and filed a DIR.

141.    The officer failed to interview N'DAYA who witnessed the assault at 25 ROOSEVELT and was present at the hospital.

142.    When REED came to the hospital, DIANE refused to see him because she feared that he was going to kill her.

143.    DIANE spoke with a domestic violence assistance organization and told them about REED's assault.

144.    On April 18, 2011, detectives from the NCPD went to 25 ROOSEVELT to arrest REED, but did not find him there.

145.    A temporary order of protection was issued on April 18, 2011 against REED in favor of DIANE.

146.    That same day NCSD officers served REED with the order of protection at 25 ROOSEVELT, but did not confiscate his gun.

147.    REED told the NCSD officers that he heard the police were looking for him to which NCSD responded by calling the HPD.

148.    Although HPD responded and arrested REED, they brought him to the NCPD.

149.    Despite the reports regarding his gun and unambiguous language of the restraining order, HPD and NCPD also failed to take his firearm.

150.    On April 19, 2011, REED was arraigned in First District Court in Nassau County.

151.    REED was charged with felony assault in the second degree (PL 120.05(2)) and criminal possession of a weapon in the third degree (PL 265.02(1)).

152.    In connection with the assault and weapons possession, REED spent fifteen days in jail.

153.    On February 2, 2012, REED plead guilty to attempted assault in the third degree with intent to cause serious physical injury (PL 120.00(1)).

154.    The Hon. Norman St. George, Supreme Court, Nassau County, sentenced REED to 15 days in jail, a $250 fine and a permanent order of protection in favor of DIANE which ordered REED to:

> [02] Refrain from assaulting, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats or any criminal offense against DIANE REED (DOB: 10/18/1970).
>
> [12] Surrender any and all handguns, pistols, revolvers, rifles, shotguns and other firearms owned or possessed, including but not limited to, the following: ALL FIREARMS/WEAPONS and do not obtain any further guns or other firearms.  Such surrender shall take place immediately, but in no event later than TODAY AT 5PM at NASSAU COUNTY POLICE HEADQUARTER;

155.    The Order was to remain in force until and including February 1, 2014.

156.    REED did not surrender his 9 mm Ruger P89, and there were no attempts by law enforcement to locate or confiscate it despite reasonable cause to do so.

157.    When REED was released from jail there was a brief period of calm, but eventually REED returned to his violent ways and routinely violated the order of protection.

158.    DIANE and N'DAYA told members of the HPD that REED's abuse was intensifying.

159.    Throughout 2012, the domestic violence continued to escalate and REED often threatened DIANE with his gun.

160.    In October 2012, REED put his gun to DIANE's head and threatened to kill her.

161.    On or about November 6, 2013, DIANE and N'DAYA fled 25 ROOSEVELT to escape REED.

162.    DIANE went to a safe house.

163.    N'DAYA began staying at the home of a friend from school.

164.    DIANE did not disclose her plans to leave to REED.

165.    On or about November 8, 2012, REED filed a missing persons report for DIANE with the HPD.

166.    This report was referred to the NCPD for investigation.

167.    HPD knew that DIANE had fled to a safe house for domestic violence victims.

168.    HPD shared this information with the NCPD.

169.    At approximately 5:00 pm on November 9, 2012, REED stormed into N'DAYA's place of employment, demanded that N'DAYA tell him where she and DIANE

were staying, and threatened that if she did not tell him where her mother was, N'DAYA would "come up missing" and he would kill them both.

170.    N'DAYA was terrified by REED's threats and looked to the police for protection.

171.    HPD responded to N'DAYA's place of employment and she told the officers that she feared for her own and her mother's safety.

172.    HPD prepared a DIR in connection with this incident.

173.    Although REED's conduct amounted to stalking, menacing, and aggravated harassment against N'DAYA, and a violation of DIANE's February 2012 order of protection, HPD did not arrest REED.

174.    N'DAYA, still only seventeen at the time, had to seek assistance from a counselor at school to go to family court and obtain an order of protection.

175.    On November 20, 2013, a Temporary Order of Protection was issued by the Family Court of the State of New York, County of Nassau, which ordered *inter alia* that REED observe the following conditions of behavior:

> (1)    Stay away from:  N'DAYA Y Lee; the home of N'DAYA Y Lee at 25 Roosevelt Street, Hempstead, NY 11550; the place of employment of N'DAYA Y Lee;
>
> (2)    Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other electronic or any other means with N'DAYA Y Lee;
>
> (3) Permit REED to enter the residence at 25 Roosevelt Street, Hempstead, NY 11550 one time with police escort to remove personal belongings;
>
> (4) Surrender any and all handguns, pistols, revolvers, rifles, shotguns and other firearms owned or possessed, including, but not limited to, the following: All firearms and weapons and do not obtain any further guns or other firearms. Such surrender shall take

place immediately, but in no event later than immediately upon service of this order at the appropriate law enforcement agency; and

(5) vacate the premises forthwith with police assistance.

176. The November 20 order specified "Service directed by Police Service". The Court further directed N'DAYA to return on November 26, 2012 to confirm the *ex parte* order.

177. On November 20, 2012 at 9:50 p.m. at 25 ROOSEVELT, NCSD defendants FLANAGAN and JOHN or JANE DOE served a temporary order of protection, summons, petition, vacate, and weapons removal on REED.

178. Upon information and belief, REED left 25 ROOSEVELT on November 20th at the officers' direction, but did not pack or carry with him any clothes or personal possessions, making it obvious and inevitable that he intended to return to 25 ROOSEVELT.

179. Despite the mandate of the protective order that NCSD officers were serving, the testimony in court that same day regarding REED's gun, the prior February 2012 order, and the numerous prior records that reflect REED having a gun, NCSD officers did not confiscate REED's gun.

180. REED returned to 25 ROOSEVELT that same night and continued to stalk DIANE and N'DAYA.

181. Upon information and belief, on November 26, 2012, REED and N'DAYA appeared in Family Court, Nassau County before the Hon. Delligatti for a hearing to confirm the November 20 order of protection; DIANE attended this hearing with personnel from the safe house.

182. After the proceeding concluded, REED aggressively confronted DIANE and N'DAYA in the hallway of the courthouse; there were no consequences for this violation.

183.    Immediately following the court proceeding, while still in the presence of the court officers, an undeterred and unrepentant REED, violated the order.

184.    DIANE and N'DAYA asked for assistance from a court officer, who escorted them out a back entrance so that REED could not follow them to the parking lot.

185.    REED moved out of 25 ROOSEVELT and stayed next door with neighbors at 27 Roosevelt Street.

186.    REED stayed steps away to stalk 25 ROOSEVELT and observe whether N'DAYA or DIANE returned.

187.    REED returned to 25 ROOSEVELT daily and maintained possession of his illegal gun.

188.    REED's conduct was in violation of both orders of protection.

189.    On December 28, 2012, while asleep in her bedroom in the basement of 25 ROOSEVELT, SHETIA awoke to burglars in the home.

190.    SHETIA called 9-1-1 and two HPD officers responded and took a report.

191.    Upon information and belief, the responding officers were defendants RIDLEY and COHEN.

192.    SHETIA explained to the officers that she was currently living alone at 25 ROOSEVELT because DIANE and N'DAYA were hiding from REED.

193.    SHETIA told the HPD officers that, in violation of both orders, REED came to 25 ROOSEVELT every day to pick-up mail, look for misplaced items and check if N'DAYA or DIANE had been in the house.

194.    SHETIA told the officers that REED had been at 25 ROOSEVELT before the officers arrived.

195.    When the HPD officers asked why REED left, SHETIA explained that REED was not supposed to be at 25 ROOSEVELT because of the orders of protection.

196.    The HPD officers asked SHETIA for information about REED, and informed SHETIA that they believed REED was responsible for the burglary.

197.    The HPD officers knew or should have known that there was a court order prohibiting REED from coming to 25 ROOSEVELT.

198.    The HPD officers knew or should have known that REED had a criminal history.

199.    The HPD officers knew or should have known that REED possessed an illegal firearm.

200.    The HPD officers knew or should have know that REED had a propensity to commit violence and/or violent acts.

201.    The HPD officers knew or should have known where to locate REED.

202.    The MUNICIPAL DEFENDANTS knew or should of have known about these violations, but did not investigate, issue a warrant, or take steps to find or arrest REED.

203.    On January 4, 2013, at approximately 11:00 a.m., DIANE returned to 25 ROOSEVELT with a cadre of law enforcement officers from HPD and NCPD.

204.    Among the officers present that day inside 25 ROOSEVELT was defendant PETTWAY of the HPD.

205.    While at 25 ROOSEVELT on January 4, 2013, PETTWAY and SHETIA spoke about the burglary on December 28, 2013.

206.    PETTWAY and SHETIA discussed REED, his habits, his hangouts, and PETTWAY told SHETIA and DIANE that the HPD was looking for REED and would arrest him.

207.   PETTWAY asked DIANE, who was staying in a secret safe house, where she was staying.

208.   PETTWAY represented that the HPD was familiar with REED, knew he sold drugs at the Shamrock gas station, and knew the people with whom he hung out and sold drugs.

209.   DIANE confirmed this information.

210.   Later that day, REED came to 25 ROOSEVELT, as he did every day, and asked SHETIA who took the mail.

211.   Approximately one week later, two men came to 25 ROOSEVELT and changed the locks on the doors.

212.   One of the men was an HPD officer, known to the women of 25 ROOSEVELT.

213.   The HPD officer gave N'DAYA and SHETIA a key and told them not to share it with anyone.

214.   By these and other acts, the MUNICIPAL DEFENDANTS acknowledged that REED was dangerous and instilled in DIANE and N'DAYA a false sense of confidence that the HPD would keep them safe.

215.   At approximately 10:15 p.m. on January 29, 2013, SHETIA and N'DAYA were at 25 ROOSEVELT and observed REED drive past the house multiple times, stalking the residence.

216.   N'DAYA and SHETIA then observed REED walking up the block clad in all black.

217.   Soon thereafter a sensor light in the back of the house turned on, alerting the girls that REED was circling the house.

218.   N'DAYA called 9-1-1 and spoke with an HPD operator.

219.    N'DAYA reported her location, that she had an order of protection against REED, that REED had threatened her and her mother previously and that he was on the property.

220.    While N'DAYA was speaking with the HPD operator, REED attempted to force his way into the house.

221.    HPD officers BUCCELLATO and PETTWAY responded to 25 ROOSEVELT.

222.    As they neared the house, REED fled.

223.    N'DAYA and SHETIA informed PETTWAY and BUCCELLATO of what had occurred and that REED had been on the property, in violation of both orders of protection.

224.    PETTWAY stated that he remembered coming to 25 ROOSEVELT on January 4 and speaking with DIANE.

225.    PETTWAY and BUCCELLATO confirmed with the HPD dispatcher that N'DAYA's order of protection was valid and in effect.

226.    N'DAYA informed PETTWAY and BUCCELLATO that she was scared of REED and wanted him arrested.

227.    N'DAYA and SHETIA reiterated to the HPD officers that REED had a gun – the same gun he used to pistol-whipped DIANE in April 2011 – and could be found at the Shamrock gas station or Brothers Deli, both on S. Franklin Street in Hempstead, where he sold marijuana.

228.    This information had already been conveyed to the HPD numerous times.

229.    The HPD officers completed a DIR noting REED's violation of N'DAYA's order of protection, his access to weapons and that there was a history of domestic violence at 25 ROOSEVELT.

230.    HPD defendant HAYMAN signed the DIR as the supervising officer.

231.    In connection with this report, PETTWAY opened a case for criminal contempt against REED.

232.    The HPD officers informed the girls that there would now be a warrant for REED's arrest.

233.    The officers represented to N'DAYA and SHETIA that they knew who REED was, could identify his car, knew where to find him and assured the girls that they should not worry, "we'll get him."

234.    By these and other acts, HPD officers instilled a false sense of confidence in the girls that the HPD would protect them from REED.

235.    HPD forwarded a report of the January 29, 2013 incident to the NCPD.

236.    NCPD, including defendant BITTNER, failed to take meaningful steps to investigate and locate REED.

237.    On February 1, 2013, DIANE returned to 25 ROOSEVELT from the safe house with Yohanna Paulito ("PAULITO") and her one-month old baby daughter.

238.    REED, who had been stalking DIANE and N'DAYA since November 2012, immediately came to 25 ROOSEVELT and gave DIANE a notebook containing ranting love letters.

239.    REED's actions violated both orders of protection.

240.    REED's actions were reported to members of the HPD.

241.    The MUNICIPAL DEFENDANTS failed to arrest REED for his crimes and violations of the orders, sending the message to REED, who was growing more emotionally

unstable, that he was immune from punishment, thereby increasing the danger to DIANE and N'DAYA.

242.    REED continued to stalk 25 ROOSEVELT and its residents with the confidence that there would not be consequences for his crimes.

243.    REED's sense of impunity was galvanized by a confrontation with police at 25 ROOSEVELT on February 3, 2013.

244.    On February 3, 2013, SHETIA and N'DAYA were at a nearby restaurant to purchase food for the Super Bowl, which was about to start.

245.    DIANE and PAULITO contacted N'DAYA, to call the police for DIANE.

246.    N'DAYA called 9-1-1 and spoke with an HPD Operator.

247.    N'DAYA informed the operator that she had an order of protection against her stepfather, he was at her home, he was harassing her mother, and he was very violent.

248.    HPD dispatched the following radio run to its officers:   "Respond to 25 Roosevelt Street for disturbance, possible violation of order protection. The complainant's name is D'Naya [sic]."

249.    HPD officers MULHEARN and GUEVREKIAN received the transmission and responded to 25 ROOSEVELT.

250.    N'DAYA and SHETIA pulled up as the officers arrived.

251.    DIANE was inside the front door of the house, and REED was on the steps.

252.    REED was in violation of both orders of protection.

253.    MULHEARN and GUEVREKIAN were required by N.Y.C.P.L. §140.10 to arrest REED.

254.   Additionally, there was an open case from the January 29, 2013 incident, requiring REED's arrest.

255.   One officer approached the car while the other went and spoke with DIANE.

256.   N'DAYA told the officer that approached that she had called 9-1-1, possessed a stay away order of protection, had an open case from January 29th and that REED was supposed to be arrested.

257.   N'DAYA further told the officer DIANE was her mother, REED was her stepfather, and that her mother also possessed an order of protection against REED.

258.   The officer who spoke with DIANE approached REED who was now standing near his vehicle in front of 25 ROOSEVELT.

259.   N'DAYA pleaded with the officers to arrest REED.

260.   The officer who spoke with N'DAYA and SHETIA approached REED and the other officer.

261.   N'DAYA continued to plead with the officers to arrest REED.

262.   The officers patted REED down, after which time they told REED to leave.

263.   REED refused and an argument ensued between REED and the officers.

264.   Thereafter, one of officers said something to REED, which caused him to comply with the officers' instructions to leave.

265.   N'DAYA continued pleading for REED's arrest, but the officers ignored these cries for help.

266.   REED entered his vehicle and sped down the street.

267.   Upon information and belief, MULHEARN and GUEVREKIAN did not check the status of the orders of protection with their dispatcher.

268.   Upon information and belief, MULHEARN and GUEVREKIAN did not check whether there was a warrant out for REED's arrest.

269.   Upon information and belief, MULHEARN and GUEVREKIAN did not check to see whether the NCPD had an open investigation into REED.

270.   MULHEARN and GUEVREKIAN inexplicably ignored N'DAYA's pleading and affirmatively directed REED to leave 25 ROOSEVELT when both N.Y.C.P.L. §140.10 and the open warrant mandated his arrest.

271.   REED was not only infuriated; he was convinced that no matter what he did he would have no trouble with the police.

272.   The officers' actions sanctioned REED's conduct, further emboldened him and increased the danger to DIANE and N'DAYA.

273.   After REED left, the women challenged the officers for directing REED to leave when he should have been arrested, showed them the police report from January 29, 2013 and the orders of protection, and reiterated REED's history of violence, the recent encounters with police, that REED had a gun and that they feared he would return.

274.   DIANE also added that REED was constantly bothering her, pistol-whipped her in April 2011 and threatened her with his gun all the time.

275.   MULHEARN and GUEVREKIAN attempted to excuse their conduct by saying that because DIANE's order was not a full stay away order and because N'DAYA was not inside the house they could not arrest REED.

276.   The officers also told the women not to worry, that they would find and arrest REED.

277.   The officers then made small talk with the women, chatting briefly about PAULITO's baby and the Super Bowl before leaving.

278.   The officers filed a false DIR report on February 3, 2013.

279.   Upon information and belief, information about this incident was not forwarded to the NCPD and no case was opened.

280.   Upon information and belief, BITTNER and/or other NCPD detectives that were, or should have been, looking for REED in connection with the January 29th incident were not informed of HPD's encounter with REED.

281.   At approximately 6:50 pm, MULHEARN called HAYMAN, his supervisor, and the following conversation occurred:

| | |
|---|---|
| **HAYMAN**: | Hempstead Police, Lieutenant HAYMAN. |
| **MULHEARN**: | This is Mulhearn, what's up? |
| **HAYMAN**: | Hey, Eddy. I'm just, think ... I'm looking at that address you're at, 25 Roosevelt Street? I think last week on my days, we had a problem there ... or my last set of nights where a guy was driving around in a black b-, uh, Mercedes.  Leonard Reed. |
| **MULHEARN**: | Right, right. |
| **HAYMAN**: | And he's got an open complaint against him. He might have a gun in the car… |
| **MULHEARN**: | Ok. [UI]… |
| **HAYMAN**: | Is that who you're dealing with? Or no? |
| **MULHEARN**: | Yea, well, when we got here, um, we talked to the female… |
| **HAYMAN**: | Yea. |
| **MULHEARN**: | … and she said he was here he didn't violate the order. |
| **HAYMAN**: | OK. |
| **MULHEARN**: | And then when we came back later on |
| **HAYMAN**: | Well he had. He had to violate, its a stay-away order, it has ... right? |
| **MULHEARN**: | No it, against the mother, it's a refrain from. So he came here, he dropped off some Bible passages and stuff like that, and we were |

|  |  |
|---|---|
| | like Alright, well, he didn't violate the order… |
| **HAYMAN**: | He dropped off Bible passages? |
| **MULHEARN**: | Bible- yea he's trying to reconcile with her. |
| **HAYMAN**: | [Laughs] |
| **MULHEARN**: | He underlined some Bible passages and was like, Oh here. The daughter, um, wanted… the moms… |
| **HAYMAN**: | I- I think it's a - I think it's a stay-away order because Vito Bu, Buccelato's stepping shaking his head like [laughs]… |
| **MULHEARN**: | What's that? |
| **HAYMAN**: | Oh, the stepdaughter has the stay-away. |
| **MULHEARN**: | The stepdaughter, right. |
| **HAYMAN**: | I got you. OK |
| **MULHEARN**: | And we were here for a while, and the stepdaughter came and said, oh, we- we made a case on him the other day. |
| **HAYMAN**: | Yeah, yeah, yeah. |
| **MULHEARN**: | … I asked um, the mom, I said, well, why didn't you tell us about that? She goes, I completely forgot all about it. |
| **HAYMAN**: | So he was there and now he's gone? |
| **MULHEARN**: | He was there. Yea, we didnt, we didn't know… |
| **HAYMAN**: | Oh shit. Ok. Alright. |
| **MULHEARN**: | … The mom didn't tell us and she said she didn't know about it. |
| **HAYMAN**: | Ok. Well, |
| **MULHEARN**: | so ahhh… |
| **HAYMAN**: | OK we'll get him. |
| **MULHEARN**: | Yeah, yeah, that's what I said. She said that, uh, he's around…. |
| **HAYMAN**: | Ok. |
| **MULHEARN**: | …and uh, yeah the mom, the mom's got a refrain from |
| **HAYMAN**: | Ok. |
| **MULHEARN**: | …and when he came here, he just dropped off Bible passages… |
| **HAYMAN**: | Ok. |
| **MULHEARN**: | …and it wasn't a problem. |
| **HAYMAN**: | Alright. |
| **MULHEARN**: | The daughter called who wasn't here… |
| **HAYMAN**: | Yeah. |
| **MULHEARN**: | … and said that there was a- there was gonna be a problem, but… |

| | |
|---|---|
| **HAYMAN**: | Yeah. |
| **MULHEARN**: | … as soon as I got here, she was like "no… He didn't violate it I …" |
| **HAYMAN**: | Ok. |
| **MULHEARN**: | … he doesn't need to be arrested. |
| **HAYMAN**: | Alright. |
| **MULHEARN**: | And the daughter comes and she goes, well we made a case on him three days ago. I go Why didn't fucking anybody tell me? |
| **HAYMAN**: | [Laughs] |
| **MULHEARN**: | I just, you know what, I'm looking at the screen and I- and I see it and I see Vito in front of me eatin' [sic], and I said that's … that -we just had a call down there last week. And I remember someone had a black Mercedes and all that. So. |
| **MULHEARN**: | Right, right. |
| **HAYMAN**: | Aight [sic] if we see him- If we see him on the road, he's good to go, so… |
| **MULHEARN**: | Yeah. |
| **HAYMAN**: | … just be careful, alright? 'cause [sic] I- I want make sure you guys are ok. I saw that 25 Roosevelt Street and I, something… |
| **MULHEARN**: | Yeah, everything's good. |
| **HAYMAN**: | Ok. |
| **MULHEARN**: | Thanks, boss. |
| **HAYMAN**: | Alright, bye. |
| **MULHEARN**: | Bye. |

282.   The HPD was aware that REED was wanted, had a gun, had violated court orders, and presented an imminent danger to DIANE and N'DAYA.

283.   DIANE and N'DAYA relied on the HPD officers' assurances that they were going to arrest REED and that they would be safe.

284.   Upon information and belief, after HPD took the DIR, and despite their promises to the women, HPD took no further action.

285.   Because of the system of shared responsibility between HPD and NCPD, NCPD was also responsible for locating and arresting REED.

286.     The MUNICIPAL DEFENDANTS knew or should have known that REED was armed, dangerous and presented an imminent threat to DIANE and N'DAYA.

287.     The MUNICIPAL DEFENDANTS knew or should have known that REED continually violated both orders of protection.

288.     The MUNICIPAL DEFENDANTS knew or should have known that REED had an extensive criminal history.

289.     The MUNICIPAL DEFENDANTS knew or should have known that REED was growing more and more mentally and/or emotionally unstable.

290.     The MUNICIPAL DEFENDANTS knew or should have known that REED had a propensity to commit violence and/or violent acts.

291.     The MUNICIPAL DEFENDANTS knew or should have known that REED had a history of assaulting and/or threatening DIANE with his gun.

292.     The MUNCIPAL DEFENDANTS knew or should have known that REED could be found next-door at 27 Roosevelt Street, where he routinely stayed to stalk the women, in violation of the orders of protection.

293.     REED frequently drove past 25 ROOSEVELT in violation of the orders of protection; the MUNICIPAL DEFENDANTS knew or should have known REED's vehicle.

294.     The MUNICIPAL DEFEDANTS were aware that REED could be found on S. Franklin Street.

295.     The MUNICIPAL DEFENDANTS had REED's cell phone number.

296.     Pursuant to the Criminal Procedure Law of the State of New York and the Family Court Act, the MUNICIPAL DEFENDANTS had affirmative duties to arrest REED.

297.    The MUNICIPAL DEFENDANTS were aware that N'DAYA and DIANE were relying upon them for protection.

298.    The MUNICIPAL DEFENDANTS instilled in DIANE and N'DAYA a false sense of confidence that police would protect them and keep them safe, increasing the danger to DIANE and N'DAYA.

299.    The MUNICIPAL DEFENDANTS ignored their duties and the grave threat to DIANE and N'DAYA, which they facilitated through their affirmative acts, repeated sustained inaction, and gross department failures.

300.    Following February 3, 2013, REED continued to stalk the residents of 25 ROOSEVELT.

301.    REED stalked DIANE on February 6, 2013, the night before he killed her.

302.    MUNICIPAL DEFENDANTS' conduct ratcheted up the threat of danger to DIANE and N'DAYA and left them more vulnerable.

303.    On February 7, 2013, REED murdered DIANE at 25 ROOSEVELT.

304.    In the afternoon of February 7, 2013, SHETIA was asleep in her bedroom in the basement of 25 ROOSEVELT.

305.    SHETIA was awoken by the doorbell, and a few minutes later she heard REED yelling.

306.    SHETIA called N'DAYA and told her to call the police because REED was in the house threatening DIANE.

307.    N'DAYA immediately called 9-1-1 and spoke with an HPD Operator.

308.    N'DAYA told the HPD operator her name, she possessed a "stay away order of protection" against her stepfather REED, her mother possessed a "harassment order of

protection" against REED, REED was supposed to have been arrested, but is currently at 25 ROOSEVELT "trying to hit" her mother.

309.    The HPD operator confirmed that there was an order of protection and that REED was currently in the house, asked how old N'DAYA was, and then hung up on her.

310.    After speaking with N'DAYA, SHETIA heard gunshots and ran up the stairs into the kitchen of 25 ROOSEVELT.

311.    N'DAYA called SHETIA, who answered the telephone.

312.    When SHETIA opened the door, she found DIANE on the kitchen floor holding her stomach and REED standing in the same room holding his gun.

313.    N'DAYA heard screaming and crying, as her mother pleaded with REED for her life.

314.    SHETIA remained with DIANE, pleading with REED not to kill DIANE.

315.    DIANE also spoke to REED in an effort to convince him to drop his weapon.

316.    SHETIA called 9-1-1 and then heard a loud noise at the front of the house.

317.    SHETIA looked toward the noise and saw PETTWAY, who she recognized from previous times he responded to 25 ROOSEVELT.

318.    Upon information and belief, DIANE and SHETIA were relieved that PETTWAY undertook their rescue and relied on PETTWAY to protect them.

319.    SHETIA ran toward PETTWAY and screamed, in substance, that REED was killing her, referring to DIANE.

320.    Upon information and belief, SHETIA ran toward PETTWAY but could not exit the house because PETTWAY was standing in the doorway.

38

321.     Instead, SHETIA went into the front bedroom of the house, directly opposite the front door that PETTWAY blocked.

322.     Upon information and belief, PETTWAY had a clear line of fire at REED who stood before him with his black 9mm handgun.

323.     Upon information and belief, PETTWAY had a clear line of site into the kitchen where DIANE lay wounded.

324.     Upon information and belief, although PETTWAY entered the house, he did not have his weapon drawn, fire his weapon at REED, remove SHETIA or DIANE from the house, or command REED to drop his weapon.

325.     Upon information and belief, DIANE was alive when PETTWAY entered 25 ROOSEVELT.

326.     Upon information and belief, PETTWAY ran back out of the house.

327.     The MUNICIPAL DEFENDANTS, including PETTWAY, knew or should have known that there was a history of violence at 25 ROOSEVELT prior to arriving there.

328.     The MUNICIPAL DEFENDANTS, including PETTWAY, knew or should have known that REED was armed, emotionally unstable and dangerous.

329.     Based on previous incidents at 25 ROOSEVELT, the HPD dispatcher prepared the responding officers to expect an armed suspect.

330.     Upon information and belief, PETTWAY heard screaming and/or gunfire before entering 25 ROOSEVELT, but entered haphazardly.

331.     Upon information and belief, when PETTWAY exited the house he called out "shots fired" over his radio, and warned the officers on scene not to enter the house.

332.     Upon information and belief, PETTWAY did not warn his fellow officers that (i) innocent bystanders remained in the house, (ii)  DIANE was still alive, or (iii) SHETIA had fled into the front bedroom.

333.     Upon information and belief, PETTWAY took cover behind DIANE's vehicle, which was parked in the driveway.

334.     Upon information and belief, READO took up a defensive position behind the vehicle with PETTWAY.

335.     Upon information and belief, defendant COHEN took cover in the street.

336.     Upon information and belief, DIXON arrived and took cover behind REED's vehicle in the street.

337.     Upon information and belief, PETTWAY knew that DIANE and SHETIA were inside the house.

338.     Upon information and belief, PETTWAY saw SHETIA run into the front bedroom of the house.

339.     Upon information and belief, the responding officers were able to take cover safely.

340.     Despite having the safety of cover and without commanding REED to come out, drop his weapon, or make any attempt to diffuse the situation, officers, believed to be PETTWAY, READO, DIXON, COHEN, and JOHN and JANE DOES 1-20 blindly opened fire at the house, despite there being four innocent bystanders, including a baby, inside.

341.     Even though PETTWAY failed to alert them that SHETIA ran into the front bedroom, upon information and belief, the officers knew or should have known that there were innocent persons in their line of fire.

342.    Disregarding the clear risk of killing an innocent bystander, the officers blindly fired at the house with SHETIA, DIANE, PAULITO and her one-month-old baby inside.

343.    While trapped in the front bedroom, SHETIA was shot by a .45 caliber bullet indiscriminately fired by either PETTWAY, DIXON, READO, COHEN, or JOHN and JANE DOES 1-20.

344.    Upon information and belief, prior to shooting SHETIA, HPD and NCPD made no verbal commands to REED to surrender or any attempt to diffuse or end the situation.

345.    SHETIA was shot through the bedroom door; that same door contains seven additional bullet holes.

346.    SHETIA, PAULITO, and the baby hid in the front bedroom of 25 ROOSEVELT: scared, helpless, and trapped as the police fired toward them; DIANE lay wounded on the kitchen floor.

347.    While SHETIA sat bleeding from a bullet wound to the chest and DIANE lay wounded on the kitchen floor, three feet from the back door, the officers continued to antagonize REED by shooting at the house, increasing the danger to DIANE.

348.    Upon information and belief, no effort was made by officers in the rear of the house to enter through the back door while REED and other officers exchanged shots in the front of the house.

349.    Defendants PETTWAY, DIXON, READO, COHEN, and JOHN and JANE DOES 1-20 fired no less than thirty rounds into the house.

350.    Upon information and belief, the officers did not have a clear line of sight on the REED, but instead shot through the structure of the building without regard for innocent bystanders within.

351.    Upon information and belief, while the shoot out raged, no ambulances, hostage negotiation team, or the NCPD Bureau of Special Operations ("BSO") units had been dispatched by NCPD.

352.    Upon information and belief, BSO units have advanced tactical training for hostage, barricade, and active shooter situations such as this one.

353.    Upon information and belief, it is HPD and NCPD protocol in a hostage barricade situation not to enter a building and engage a suspect, but to make a perimeter and call for units with advanced training.

354.    While SHETIA sat bleeding from a bullet wound to the chest and PETTWAY, DIXON, READO, COHEN, and JOHN and JANE DOES 1-20 continued their gun battle, an NCPD operator called back SHETIA and asked her what town she was in.

355.    Additional officers from the HPD and NCPD continued to pour onto Roosevelt Street and surround the house.  Still, no one tried to talk REED out of the house, ask him to surrender, or direct the officers to stop shooting.

356.    While police continued to fire, REED disengaged from the gunfight, returned to the kitchen, exclaimed that DIANE was not dead yet, and shot and/or stabbed her again.

357.    Only after the gun battle was well underway, SHETIA already having been shot, did the HPD operator finally contact the NCPD and request that BSO units and ambulances be dispatched.

358.    Upon information and belief, the NCPD operator delayed dispatching additional units to 25 ROOSEVELT because she did not have sufficient information from HPD and NCPD officers about the number of shooters and their locations.

359.    Upon information and belief, the NCPD operator delayed dispatching units with the correct training for the situation, while the officers on scene engaged in a wild-west style shootout.

360.    Only after REED's weapon jammed did one HPD officer, READO, verbally command REED to lower his weapon and surrender.

361.    REED surrendered immediately when READO finally communicated with REED and gave verbal commands.

362.    DIANE was pronounced dead at the scene at 1:56 PM.

363.    By responding to the scene in an unreasonable manner, the MUNICIPAL DEFENDANTS aggravated REED and increased the danger to DIANE.

364.    Upon information and belief, DIANE was killed during the prolonged gun battle that ensued from when the officers arrived and antagonized REED until he surrendered.

365.    Police bullets were found in the bedrooms, hallways, walls, furniture, and SHETIA, but REED was still able to return to the back of the house and shoot DIANE again.

366.    The MUNICIPAL DEFENDANTS' actions on February 7, 2013 were the proximate cause of DIANE's death.

367.    The events of February 7, 2013 are the result of the MUNICIPAL DEFENDANTS' system, policy and training failures.

368.    Continued due diligence, investigation and discovery will reveal numerous other lapses in police response in the days and hours leading to DIANE's death that increased the danger and instigated REED's return to 25 ROOSEVELT on February 7, 2013.

## SYSTEM, POLICY, AND TRAINING FAILURES

**Failure to Meaningfully Respond to Domestic Violence**

369.    The events leading up to DIANE's death, including the death of Bird and other tragic domestic violence outcomes, make clear the policy makers of VILLAGE and COUNTY knew that their employees would confront domestic violence situations, especially as to black victims, and would be confronted with difficult choices during those situations, which proper training or supervision would make less difficult.

370.    MUNICIPAL DEFENDANTS' repeated failures to meaningfully respond to reports of domestic violence, enhancing the risk of violence, especially as to black victims, qualifies as a pattern of misconduct that would frequently cause violations of a citizen's constitutional rights, and that suggests training so inadequate as to constitutes deliberate indifference.

371.    MUNICIPAL DEFENDANTS' failure to follow-up on REED's violations and failure to make any meaningful attempt to investigate or forestall further incidents demonstrates a deliberate indifference to DIANE and N'DAYA's constitutional rights.

372.    The supervising officers of the HPD and NCPD condone a custom, policy and/or practice of willful disregard to the obvious risks posed by domestic violence situations, especially as to black victims.

373.    There is a history of MUNICIPAL DEFENDANTS' employees mishandling domestic violence and emergency response situations and these failures have frequently caused the deprivation of other citizens' constitutional rights, in particular as to black victims.

374.    The patrol officers of the HPD and NCPD who responded to 25 ROOSEVELT did not have the training and knowledge to recognize and respond properly to the imminent danger posed by REED's domestic violence against DIANE and N'DAYA.

375.    MUNICIPAL DEFENDANTS' practice of disregarding New York's twenty-year-old mandatory arrest laws, and the MUNICIPAL DEFENDANTS' officials failure to correct this practice or provide additional training constitutes deliberate indifference to the certain result that violations of constitutional rights will occur.

376.    MUNICIPAL DEFENDANTS' inaction and failure to take corrective actions in response to the system wide failures in domestic violence situations has sanctioned and tacitly authorized their subordinates' unlawful actions.

**Failure in Coordination**

377.    Upon information and belief, NCPD and HPD have overlapping responsibilities for policing in the Village of Hempstead.

378.    The events leading up to DIANE's death demonstrate that this system of coordination between the VILLAGE and COUNTY is fatally flawed.

379.    Despite confronting this failure, the policymakers of the MUNICIPAL DEFENDANTS did nothing and therefore acquiesced in the unlawful conduct.

380.    That VILLAGE pays COUNTY a fee for provision of police services demonstrates that the COUNTY is the VILLAGE's agent and/or alter ego in providing those services to its citizens.

381.    Upon information and belief, when HPD responds to a call they file reports in their own system.

382.    Upon information and belief, if an HPD officer believes a serious offense or felony has been committed, it is the policy of the MUNICIPAL DEFENDANTS for HPD officers to call the NCPD, who are then in turn responsible for investigating the matter referred.

383.    MUNICIPAL DEFENDANTS have condoned as policy the HPD custom or practice of not following-up or investigating incidents after forwarding them to the NCPD.

384.    While HPD officers made promises that they would look for REED and would arrest him, upon information and belief, HPD had no intention of seeking REED's arrest.

385.    The system of divided responsibility has created a situation of no responsibility in willful disregard to the rights of persons such as DIANE and N'DAYA.

**Failure to Adhere to Recognized Hostage/Barricade Protocols**

386.    Upon information and belief, the NCPD and HPD have policies and procedures in place, which require officers involved in a hostage/barricade situation not to engage the gunman but rather to call for assistance from a hostage negotiation team and the BSO unit.

387.    Upon information and belief, BSO units have advanced training for situations such as the one that occurred on February 7, 2013, and are vastly more qualified than the responding HPD officers to respond to such situations.

388.    Upon information and belief, in an active shooter situation, HPD and NCPD officers, if able to do so safely, are to retreat, take cover, and request back-up, including the NCPD hostage negotiation team.

389.    Upon information and belief, HPD and NCPD officers are not trained to discharge their firearms into occupied structures without a clear line of site on the target.

390.    Upon information and belief, HPD has their own firearms training facility.

391.    This facility and its programs are operated by defendants COOKE and ZOLL.

392.    Upon information and belief, ZOLL is responsible for training other HPD officers in firearms use.

393.    Upon information and belief, ZOLL was removed from patrol duty after discharging his firearm at suspects resulting in death or serious injury on two separate occasions.

394.    Upon information and belief, on July 31, 1998, ZOLL shot five times and killed a naked, mentally disturbed, black man named Paul Maxwell who was walking down the street waiving a baseball bat.

395.    Upon information and belief, on or about February 16, 2007, ZOLL shot an unarmed black suspect, Dorian Getlin, who had surrendered and was surrounded by police with his hands up.

396.    Upon information and belief, COOKE was responsible for training members of the HPD in hostage/barricade situations.

397.    Upon information and belief, during an HPD training session involving hostage negotiations, COOKE stated to the assembled officers: Q. "What should the police do if the abductor and the abductee are in a dark room?" A. Caucasian officer, responded "Send in the black officer. No one would notice him anyway."

398.    Upon information and belief, no disciplinary action was taken because this attitude is accepted and condoned by the HPD.

399.    Defendant PETTWAY testified at a previous proceeding related to this matter that he entered 25 ROOSEVELT after hearing a loud noise from outside.

400.     Upon information and belief, a police officer with adequate training would recognize the sound of gunfire from a common handgun cartridge such as the 9 mm cartridges discharged by REED.

401.     In the alternative, PETTWAY knew the sounds he heard were gunfire and entered anyway.

402.     Upon information and belief, if the responding officers had been sufficiently trained they would have known to call for back-up instead of engaging REED in a gun battle with innocent bystanders are in the line of fire.

403.     The responding officers increased the danger to DIANE by the manner in which they entered 25 ROOSEVELT by engaging REED in a gunfight.

404.     Upon information and belief, the responding officers failed to follow established protocols and procedures for hostage/barricade situations, again increasing the danger to DIANE.

405.     Upon information and belief, the responding officers did not have sufficient situational training for hostage/barricade situations.

406.     Upon information and belief, the responding officers did not have sufficient use of force and firearms training to use constructive authority or discharge their firearms in such a manner as to stop REED while they were face to face with him at close range.

407.     Upon information and belief, the responding officers did not have sufficient training to exercise the judgment necessary to stop REED and avoid putting in further peril.

**Police Operator/Dispatcher Failures**

408.    Upon information and belief, the NCPD Communications Bureau maintains an operations center, which is the primary answering point for 9-1-1 calls within Nassau County.

409.    Upon information and belief, COUNTY does not always staff the supervisor positions in the NCPD's 9-1-1 operations center.

410.    Upon information and belief, COUNTY directs operators to work as supervisors without the training required for supervisor positions.

411.    Upon information and belief, COUNTY routinely does not have adequate staffing in its 9-1-1 operations center.

412.    N.Y. County Law § 325 et seq. establishes the New York state 911 board, and charges the board with assisting local governments to facilitate the efficient and effective routing of emergency calls as well as proscribing standards for public safety answering points.

413.    21 N.Y.C.R.R. § 5201 sets forth minimum standards for call-taker/dispatcher training.

414.    In addition to the basic training standards proscribed by § 5201.3, §5201.4 requires that no call-taker/dispatcher be assigned to answer calls unless within each calendar year they complete a minimum of 21 hours of in-service training at either a recognized training academy or through an in-house training program.

415.    Upon information and belief, COUNTY failed to provide this training to the 9-1-1 system operators who were on duty on February 7, 2013.

416.    Upon information and belief, as early as 2009, COUNTY was put on notice that they had not been fulfilling the mandatory training obligation for their operators.

417.    Upon information and belief, this lack of training led to outrage by the NCPD operators and caused them to file a lawsuit in Nassau County Supreme Court in June 2013 to force the COUNTY to comply.

418.    Upon information and belief, some COUNTY operators did not have sufficient training in identifying, categorizing, and dispatching appropriate responses to hostage/barricade situations and instances such as what occurred on February 7, 2013.

419.    COUNTY's failure to train its operators and lack of staffing and/or supervision led to a response by HPD units that were neither trained nor equipped for the situation that presented itself on February 7, 2013, increasing the danger to DIANE.

420.    The coordination between the 9-1-1 and dispatch systems of the two police forces is abysmal.

421.    These failures are further evidence of the MUNICAPAL DEFENDANTS' custom, policy and practice of deliberate indifference towards their policing responsibilities.

422.    Upon information and belief, when a victim of domestic violence in the Village of Hempstead calls 9-1-1 they are connected to a NCPD 9-1-1 operator and then transferred to a HPD operator.

423.    Upon information and belief, NCPD and HPD dispatchers are not monitoring the same radio channels and were unaware of what each department's units were doing leading to mass confusion, a delayed response, and increased danger to DIANE.

424.    Upon information and belief, on February 7, 2013, while the shooting was ongoing, SHETIA dialed 9-1-1 and was connected to an NCPD Operator, believed to be Operator 417.

425.    Upon information and belief, HPD officers were already on scene at 25 ROOSEVELT when SHETIA's 9-1-1 call was received but NCPD was not aware of the incident.

426.    While HPD responded to 25 ROOSEVELT, the NCPD was unaware that a hostage/barricade situation was in progress and did not mobilize capable units in a timely manner.

427.    Upon information and belief, when the NCPD dispatcher got in touch with the HPD dispatcher several minutes after the fire fight began, HPD requested that NCPD send BSO units and ambulances.

428.    The lack of communication and coordination between HPD and NCPD resulted in a discombobulated police response that placed DIANE in more danger than if they had not responded, confronted, and antagonized REED.

429.    Because of failures by HPD and NCPD operators to properly identify the serious nature of the 9-1-1 calls they received from N'DAYA and SHETIA, HPD patrol units without knowledge of the dangerous situation they were confronting entered 25 ROOSEVELT and aggravated the situation.

430.    Had HPD and NCPD operators adequately identified the situation, units with appropriate training would have been dispatched in a timely manner and DIANE may not have been killed.

**Admissions and October 2013 Assault**

431.    In the February 3, 2013 call, HAYMAN admitted that REED should have been arrested and the officers made a mistake.

432.    Internal affairs investigations were commenced by NCPD and HPD pertaining to the police failures discussed herein.

433.    HPD officers visited neighbors of 25 ROOSEVELT in connection with their investigation and the neighbors relayed that they witnessed the officers' gross failures and willful disregard for N'DAYA's pleas for help.

434.    HPD investigators acknowledged that they had made mistakes leading to the murder of DIANE.

435.    On or about the week of March 11, 2013, a sergeant from the HPD called N'DAYA's cell phone and summoned her for questioning in connection with their internal investigation.

436.    During this meeting with members of the HPD, N'DAYA confronted the officers and asked them why they were trying to cover-up their department's mistakes?

437.    The officers asked then-eighteen-year-old N'DAYA for advice: what could they do to help so that this does not happen again?

438.    N'DAYA responded that they need to take domestic violence seriously.

439.    The officers all nodded their heads in acknowledgment.

440.    On or about October 30, 2013, almost nine months after her mother's tragic death, N'DAYA was at 25 ROOSEVELT with family and friends when HPD officers again belligerently entered 25 ROOSEVELT, this time with their guns drawn.

441.     One HPD officer lunged at N'DAYA, who was not armed or dangerous, with his gun.

442.     N'DAYA cried: "Where were you when I needed you, it's my house, where were you when I needed you?"

443.     Another HPD officer tried to calm the assaulting officer, reminding his colleague, "Remember what happened here, that's Diane's daughter".

444.     The HPD officers realized their mistake and apologized.

445.     On or about November 4, 2013, VILLAGE was notified of this incident; no response was received.

446.     Upon information and belief, none of the MUNICIPAL DEFENDANTS have been disciplined for any mistakes or failures discussed in this complaint.

447.     The MUNICIPAL DEFENDANTS must be held liable for the mistakes and failures described herein to put an end to their practice, policy and custom of willfully disregarding the deadly risks of improperly handling domestic violence situations involving black victims.

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST THE INDIVIDUAL MUNICIPAL DEFENDANTS
### (Violation of Right to Due Process - 42 U.S.C. 1983)

448.     PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 447 above as if more fully set forth at length herein.

449.     MUNICIPAL DEFENDANTS acted in concert with REED and permitted his reign of terror and abuse upon DIANE and N'DAYA in violation of DIANE and N'DAYA's rights to due process through numerous affirmative acts and by failing to investigate DIANE

and N'DAYA's complaints, failing to provide reasonable police protections, and otherwise failing to discharge their duties as law enforcement officers.

450. The MUNICIPAL DEFENDANTS aided and abetted REED in deprivation of DIANE and N'DAYA's civil rights in violation of the Due Process Clause.

451. The MUNICIPAL DEFENDANTS' actions set forth above, affirmatively created and enhanced the danger of REED committing violence against DIANE and N'DAYA, including but not limited to murder.

452. Through their interactions with REED as well as protracted inaction, the MUNICIPAL DEFENDANTS communicated to REED that he would not be arrested, punished, or otherwise interfered with while engaging in misconduct that was likely to, and did in fact, endanger the life, liberty or property of DIANE and N'DAYA.

453. The MUNICIPAL DEFENDANTS' repeated, sustained inaction, in the face of actual and potential acts of violence, by REED against DIANE and N'DAYA condoned REED's violence against DIANE and N'DAYA.

454. By communicating to REED by way of their affirmative actions and inaction, the MUNICIPAL DEFENDANTS officially sanctioned REED's private infliction of injury upon DIANE and N'DAYA.

455. The MUNICIPAL DEFENDANTS' actions may be inferred to have implicitly condoned REED's behavior and indicated to REED that he would not be disciplined for his conduct.

456. By failing to take action against REED, failing to take action when it was clear REED had committed crimes and family offenses, failing to arrest REED when he was in clear violation of the orders of protection, and failing to confiscate his weapons, the MUNICIPAL

DEFENDANTS condoned REED's actions and instilled in him a confidence that the law would not be applied to him.

457.   By failing to make reports, failing to arrest REED on an open warrant, and failing to arrest REED when required by law, the MUNICIPAL DEFENDANTS made clear that his violence would go unpunished.

458.   MUNICIPAL DEFENDANTS' actions as alleged above plainly transmitted the message to REED that his continuous domestic violence, stalking, harassment, menacing, intimidation, violation of orders of protection, possession of a firearm, and blatant disregard for the rights of DIANE and N'DAYA, was permissible and would not cause him problems with the police.

459.   MUNICIPAL DEFENDANTS' affirmative conduct, explicitly or implicitly, communicated to REED an official sanction of his violence.

460.   These assurances increased the risk of REED committing further crimes and violence against DIANE and N'DAYA.

461.   MUNICIPAL DEFENDANTS' behavior enhanced the danger to DIANE and N'DAYA by implicitly but affirmatively encouraging or condoning REED's domestic violence.

462.   The implied message of the MUNICIPAL DEFENDANTS' conduct galvanized REED to persist in violent encounters with DIANE and N'DAYA.

463.   MUNICIPAL DEFENDANTS' conduct ratcheted up the threat of danger to DIANE and N'DAYA, leaving them in a worse off situation than if the MUNICIPAL DEFENDANTS had not intervened.

464.   DIANE and N'DAYA were more vulnerable once REED was aware of the MUNICIPAL DEFENDANTS' dismissive and indifferent attitude toward DIANE and N'DAYA's complaints and this awareness nullified the deterrent capacity of police response.

465.   By their affirmative conduct, MUNICIPAL DEFENDANTS' enhanced the danger to DIANE because they conveyed to REED that he could continue to engage in domestic violence and in doing so violated DIANE and N'DAYA's due process rights.

466.   MUNICIPAL DEFENDANTS' conduct enhanced the danger to DIANE and N'DAYA, and amounted to deliberate indifference since their actions showed a willful disregard of the obvious risks of a domestic violence situation.

467.   The MUNICIPAL DEFENDANTS actually contributed to the vulnerability of DIANE and N'DAYA.

468.   As a direct and proximate result of the aforesaid acts and omissions, MUNICIPAL DEFENDANTS have deprived DIANE and N'DAYA of their right to due process.

469.   Based on the foregoing, MUNICIPAL DEFENDANTS are liable to PLAINTIFF under section 1983 for the injuries caused by REED's misconduct.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AGAINST MUNICIPAL DEFENDANTS**
**(Violation of Equal Protection Clause -  Injunctive Relief)**

470.   PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 469 above as if more fully set forth at length herein.

471.   By failing to apply the law equally on the basis of race and failure to discharge their duties in a non-discriminatory manner, MUNICIPAL DEFENDANTS violated DIANE and N'DAYA's equal protection rights.

472.     MUNICIPAL DEFENDANTS have an unspoken policy, custom, and/or practice of treating complaints of domestic violence towards black victims differently.

473.     MUNICIPAL DEFENDANTS policy and/or practice of affording less protection to black victims of domestic violence than to non-black victims of domestic violence in comparable circumstances is motivated by discrimination based on race, and was the proximate cause of DIANE and N'DAYA's injuries.

474.     MUNICIPAL DEFENDANTS acting through the NCPD, NCSD, and HPD condoned a pattern or practice of affording inadequate protection, or no protection at all, to black victims of domestic violence who have complained of having been abused by their husbands, stepfathers, or others with whom they have a close relationship.

475.     In COUNTY and VILLAGE law enforcement, there are department-wide practices of disparate treatment for domestic disputes involving black victims.

476.     DIANE and N'DAYA's complaints of domestic violence were treated differently than complaints of non-black victims because of their race.

477.     Upon information and belief, MUNICIPAL DEFENDANTS afford non-black victims of domestic violence more protection than black victims of domestic violence in that MUNICIPAL DEFENDANTS *inter alia* respond with more competence, are more likely to adhere to police department procedures, are more likely to follow mandatory arrest laws, are more likely to complete domestic incident reports, and are more likely to investigate and refer matters for prosecution.

478.     The NCPD, NCSD, and HPD's constitutional abuses were and are directly and proximately caused by policies, practices and/or customs devised, implemented, enforced, encouraged and sanctioned by the COUNTY, VILLAGE, and their respective officials,

including: (a) the failure to adequately and properly screen, train and supervise their law enforcement officers; (b) the failure to adequately and properly monitor and discipline their law enforcement officers; and (c) the encouragement and sanctioning of and failure to rectify the aforementioned differential treatment in responding to incidences of domestic violence.

479.    Each of the MUNICIPAL DEFENDANTS has acted with deliberate indifference to the Fourteenth Amendment rights of DIANE and N'DAYA.  As a direct and proximate result of the aforesaid acts and omissions of the MUNICIPAL DEFENDANTS, the Fourteenth Amendment rights of DIANE and N'DAYA have been violated. By their acts and omissions, MUNICIPAL DEFENDANTS have acted under color of state law to deprive DIANE and N'DAYA of their Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

480.    Due to MUNCIPAL DEFENDANTS affording less protection to black victims of domestic violence than to other victims of domestic violence in comparable circumstances, a real and immediate threat exists that the Fourteenth Amendment rights of N'DAYA and other similarly situated to DIANE and N'DAYA will be violated by MUNICIPAL DEFENDANTS in the future.  Moreover, because MUNICIPAL DEFENDANTS' polices, practices and/or customs subject N'DAYA and others similarly situated to differential treatment on the basis of race, N'DAYA and others similarly situated cannot alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the MUNICIPAL DEFENDANTS.

481.    N'DAYA and others similarly situated have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless MUNICIPAL DEFENDANTS are enjoined from continuing the policy, practice and/or custom of affording less protection to black victims of domestic violence than to other victims of domestic violence

in comparable circumstances, and the policies, practices and/or customs that have directly and proximately caused such constitutional abuses.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST MUNICIPAL DEFENDANTS**
**(Violation of Equal Protection Clause - Damages)**

482.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 481 above as if more fully set forth at length herein.

483.    MUNICIPAL DEFENDANTS denied DIANE and N'DAYA equal access to the services and protections of HPD and NCPD based on their race.  Such discrimination violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

484.    MUNICIPAL DEFENDANTS acted under color of state law to deprive DIANE and N'DAYA of their Fourteenth Amendment rights. A cause of action is created by 42 U.S.C. § 1983.

485.    As a direct and proximate result of the above-mentioned acts, DIANE and N'DAYA have suffered injuries and damages.

486.    As a direct and proximate result of the MUNICIPAL DEFENDANTS' violations of the Equal Protection Clause, DIANE and N'DAYA have suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

487.    The INDIVIDUAL DEFENDANTS undertook their unlawful conduct intentionally and maliciously with respect to DIANE and N'DAYA and their federally protected rights, entitling PLAINTIFF to recover punitive damages against the INDIVIDUAL DEFENDANTS.

488.    Additionally and in the alternative, INDIVIDUAL DEFENDANTS undertook their unlawful conduct recklessly with respect to DIANE and N'DAYA and their federally protected rights, entitling PLAINTIFF to recover punitive damages against them.

## AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST COUNTY AND VILLAGE
### (Municipal Liability - 42 U.S.C. 1983)

489.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 488 above as if more fully set forth at length herein.

490.    Defendants COUNTY and VILLAGE have directly and proximately caused the HPD, NCPD, and NCSD's policies, practices and/or customs of violating constitutional and federally protected rights.

491.    COUNTY and VILLAGE have a policy, practice and/or custom of enhancing the danger to victims of domestic violence, in particular black victims of domestic violence, with deliberate indifference to the rights of those victims by:

a.   failing to treat domestic violence seriously;

b.   failing to investigate complaints of domestic violence;

c.   communicating to abusers through their interactions and inactions that abusers will not be arrested, punished, or otherwise interfered with while engaging in misconduct that will endanger the life, liberty or property of their victims;

d.   condoning violence against and sanctioning the personal infliction of violence upon victims through repeated, sustained inaction, in the face of actual and potential acts of violence;

e.   communicating through inaction and affirmative actions that abusers will not be disciplined for their conduct;

f.  failing to take action against abusers when it is clear they have committed crimes and family offenses;

g.  failing to take action against abusers when in clear violation of orders of protection;

h.  failing to confiscate weapons despite mandates in orders of protection;

i.  instilling confidence in abusers that the law will not be applied to them through repeated inaction;

j.  failing to make reports required by law;

k.  failing to confirm open warrants and orders of protections against purported abusers;

l.  failing to arrest abusers on open warrants;

m.  nullifying the deterrent capacity of police response;

n.  providing false representations to victims that they will be protected, upon which it is foreseeable they would rely;

o.  failing to provide reasonable police protections;

p.  otherwise failing to discharge their duties as law enforcement agents; and

q.  by tolerating the aforementioned behaviors by the INDIVIDUAL DEFENDANTS.

492.   The result of this policy, practice and/or custom is increasing the risk of abusers committing further crimes and violence against victims; encouraging and condoning domestic violence; enhancing the danger to victims of domestic violence, and leaving victims in a worse off situation than if the HPD, NCPD, and NCSD do not intervene and is a violation of rights.

493.   COUNTY and VILLAGE have directly and proximately caused the NCPD, NCSD, and HPD's policy, practice and/or custom of violating due process and equal protection rights by devising, implementing, enforcing, adopting, sanctioning and ratifying a policy, practice and/or custom of: (a) failing to properly screen, train, and supervise police officers, police supervisors, and emergency operators; (b) failing to adequately monitor and discipline the NCPD, NCSD, HPD and their officers; and (c) encouraging, sanctioning and failing to rectify the NCPD, NCSD, and HPD's constitutional abuses.

494.   As a direct and proximate result of the aforesaid acts and omissions, COUNTY and VILLAGE have each deprived DIANE and N'DAYA of their federally protected rights.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST COUNTY and VILLAGE
**(Intentional Discrimination under Title VI -  42 U.S.C § 2000(d), *et seq*.)**

495.   PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 494 above as if more fully set forth at length herein.

496.   The NCPD is a municipal agency in receipt of funding from the federal government.

497.   The HPD is a municipal agency in receipt of funding from the federal government including but not limited to monies provided by VAWA.

498.   Discrimination based on race is prohibited by recipients of federal financial assistance under 42 U.S.C. § 2000(d), et seq.

499.   MUNICIPAL DEFENDANTS intentionally discriminated against DIANE and N'DAYA based on their race in violation of Title VI of the Civil Rights Act and its implementing regulations.

500.    As a direct and proximate result of MUNICIPAL DEFENDANTS' actions, DIANE and N'DAYA have suffered injuries and damages and have been deprived of their rights under the civil rights laws.

### AS AND FOR A SIXTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANTS
### (Discrimination under Equal Protection Clause of the New York State Constitution)

501.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 500 above as if more fully set forth at length herein.

502.    MUNICIPAL DEFENDANTS denied DIANE and N'DAYA equal access to the services and protections of the NCPD and HPD based on their race. Such discrimination violates the Equal Protection Clause of the New York State Constitution.

503.    As a direct and proximate result of the above-mentioned acts, DIANE and N'DAYA have suffered injuries and damages.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANTS
### (Negligence - Special Relationship)

504.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 503 above as if more fully set forth at length herein.

505.    Prior to DIANE's death on February 7, 2013 and other instances of domestic violence alleged herein, DIANE and N'DAYA had notified the MUNICIPAL DEFENDANTS numerous times that REED had threatened DIANE and N'DAYA with physical harm.

506.    Prior to DIANE's death on February 7, 2013, the MUNICIPAL DEFENDANTS knew or should have known the grave danger REED posed to DIANE and N'DAYA, and the risks of his continued acts of domestic violence.

507.    An officer from the HPD changed the locks on 25 ROOSEVELT.

508.    MUNICIPAL DEFENDANTS instructed N'DAYA to call 9-1-1 and ask for Hempstead if REED threatened her or her mother.

509.    PETTWAY, BUCCELLATO, MULHEARN, GUEVREKIAN, and officers JOHN OR JANE DOES 1-10 made representations and assurances to N'DAYA and DIANE and took affirmative actions indicating that they would protect DIANE and N'DAYA from REED.

510.    DIANE and N'DAYA relied on these and other representations and actions, affirmative and implied, by the MUNICIPAL DEFENDANTS that the women could rely on the police's protection.

511.    The actions of the MUNICIPAL DEFENDANTS instilled in DIANE and N'DAYA a false sense of confidence that they would be safe from REED.

512.    DIANE and N'DAYA relied on the aforesaid representations and assurances, and their reliance was reasonable under the circumstances.

513.    Contrary to and in breach of the aforesaid representations and assurances by MUNICIPAL DEFENDANTS, MUNICIPAL DEFENDANTS failed to take the proper steps necessary to meet the threat presented by REED.

514.    As a result of the foregoing, DIANE was harassed, stalked, menaced, endangered, assaulted, threatened, injured, and eventually murdered by REED.

515.    As a result of the foregoing, N'DAYA was harassed, stalked, menaced, endangered, assaulted, threatened, and injured by REED.

516.    The aforesaid incident and resulting personal injuries were caused by the negligence of the VILLAGE, COUNTY, their agents, servants and/or employees, in failing to protect DIANE and N'DAYA; in breaching a special duty to DIANE and N'DAYA; in causing

DIANE and N'DAYA to rely to their detriment on representations and assurances made by the MUNICIPAL DEFENDANTS herein; in failing to take the necessary steps to prevent the attack on DIANE, although said attack was foreseeable; in causing and/or allowing DIANE to sustain personal injuries; and in otherwise being negligent.

517.    By reason of the aforesaid, N'DAYA was caused to sustain serious, severe, injuries, and damages.

518.    By reason of the aforesaid, DIANE was caused to sustain serious, severe and painful personal injuries, which resulted in her death.

**AS AND FOR A EIGHTH CAUSE OF ACTION**
**AGAINST MUNICIPAL DEFENDANTS**
**(Negligent Rescue)**

519.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 518 above as if more fully set forth at length herein.

520.    By responding to N'DAYA and SHETIA's 9-1-1 calls on February 7, 2013, MUNICIPAL DEFENDANTS provided DIANE with aid or protection and undertook to rescue her.

521.    By entering 25 ROOSEVELT in the manner alleged herein, the MUNICIPAL DEFENDANTS provided DIANE with aid or protection and undertook to rescue her.

522.    By retreating and leaving DIANE within the house and shooting-up the house, antagonizing REED and engaging him in a gun battle such that he believed he would be killed by police, the MUNICIPAL DEFENDANTS discontinued that aid or protection leaving DIANE in a worse position than when they found her.

523.    When MUNICIPAL DEFENDANTS entered 25 ROOSEVELT, DIANE was alive.

524.     When MUNICIPAL DEFENDANTS arrived at 25 ROOSEVELT, DIANE and SHETIA were pleading with REED not to murder DIANE.

525.     The MUNICIPAL DEFENDANTS could have safely taken cover, made verbal commands to REED, or otherwise followed proper police standards and protocols but acted otherwise.

526.     Although MUNICIPAL DEFENDANTS undertook to respond to 25 ROOSEVELT they did so without reasonable care.

527.     Based on the above-mentioned actions and inactions in responding to 25 ROOSEVELT, the MUNICIPAL DEFENDANTS failed to exercise reasonable care to secure the safety of DIANE during their rescue.

528.     As a result of the aforesaid recklessness, carelessness and negligence of the INDIVIDUAL DEFENDANTS, while they were acting within the scope of their respective employments by VILLAGE and COUNTY, and through no culpable conduct of her own, DIANE was caused to sustain serious, severe and painful personal injuries, which resulted in her death.

## AS AND FOR A NINTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANTS
**(Negligence)**

529.     PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 528 above as if more fully set forth at length herein.

530.     The MUNICIPAL DEFENDANTS had a duty to act with reasonable care toward DIANE and N'DAYA.

531.     The INDIVIDUAL DEFENDANTS, while acting in the course and scope of their respective employments by COUNTY and VILLAGE, were negligent in failing to properly

handle the obvious risk of the domestic violence situation at 25 ROOSEVELT, undertake a coordinated police response, follow proper police procedures and tactics, timely request back-up officers and medical personal, timely dispatch a hostage negotiation team and BSO units before confronting REED, and by entering 25 ROOSEVELT, engaging REED, failing to use verbal commands or try to deescalate the situation, aggravating the situation, retreating, failing to remove DIANE from 25 ROOSEVELT despite the opportunity to do, shooting blindly into the house with knowledge that innocent bystanders were within, and creating a situation such that REED felt death was imminent and there would be no further consequences for murdering DIANE.

532.    The negligence and negligent acts of the INDIVIDUAL DEFENDANTS, while acting in the course and scope of their respective employments by COUNTY and VILLAGE, were the proximate cause of DIANE and N'DAYA's injuries.

533.    COUNTY and VILLAGE are liable for the acts of the INDIVIDUAL DEFENDANTS under the doctrine of *respondeat superior*.

534.    The negligence and negligent acts of the MUNICIPAL DEFENDANTS caused DIANE and N'DAYA to suffer and sustain physical pain, suffering and injury, extreme emotional pain, suffering and distress, fear of imminent death, and to otherwise sustain physical and emotional damages.

535.    As a result of the aforesaid recklessness, carelessness and negligence of the INDIVIDUAL DEFENDANTS, while they were acting within the scope of their respective employments by VILLAGE and COUNTY, and through no culpable conduct of her own, DIANE was caused to sustain serious, severe and painful personal injuries, which resulted in her death.

## AS AND FOR A TENTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANTS
**(Negligent Training, Hiring, Supervision)**

536.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 535 above as if more fully set forth at length herein.

537.    At all times hereinafter mentioned and at the time of the occurrences herein and prior thereto, the MUNICIPAL DEFENDANTS owed a duty of care to DIANE and N'DAYA to use reasonable care in the hiring, training, supervision and retention of their employees including patrol officers, 9-1-1 operators and supervisors, and the INDIVIDUAL DEFENDANTS, to ensure that they properly performed their duties without unnecessarily endangering innocent people such as DIANE and N'DAYA.

538.    The MUNICIPAL DEFENDANTS were negligent in hiring, training, retaining and supervising their employees, including patrol officers in this uncoordinated system of policing, 9-1-1 operators and supervisors whom they knew, or in the exercise of due care, should have known, were unfit to perform their duties, to exercise proper comportment and judgment to carry out their duties, to follow and carry out decision making skills, police protocols, procedures, and/or tactics, and responsibly coordinate the foregoing.

539.    The MUNICIPAL DEFENDANTS were negligent in failing to have, use, and enforce proper protocols and procedures to uncover, investigate, discharge, suspend or otherwise discipline employees including the INDIVIDUAL DEFENDANTS.

540.    The MUNICIPAL DEFENDANTS knew that their employees would confront situations and issues in their work, and that, without proper supervision, training, comportment, judgment, and decision making skills, would fail to employ proper tactics, procedures, and

protocols, and would make wrong, incorrect, and potentially deadly decisions regarding domestic violence, active shooter and hostage/barricade situations.

541.    The MUNICIPAL DEFENDANTS were negligent in creating a system of concurrent policing that resulted in a lack of responsibility, ineffective investigation, and substandard incident response.

542.    COUNTY was negligent, careless, reckless and deliberately indifferent in training and supervising their 9-1-1 operators and supervisors in that COUNTY was aware of deficiencies in their training and, despite being on notice of such deficiencies, failed to properly train these employees.

543.    The MUNICIPAL DEFENDANTS were negligent, careless, reckless and deliberately indifferent in training and supervising their employees, including the patrol officers named herein, in that, upon information and belief, said defendants were aware of deficiencies in their training from the several other instances of improper use of force by officers who went through the same Nassau County training programs, and despite being on notice of such deficiencies, failed to properly train the INDIVIDUAL DEFENDANTS.

544.    The acts and conduct of the INDIVIDUAL DEFENDANTS, within the scope of their respective employments by COUNTY and VILLAGE, were the direct and proximate cause of the injury and damage to DIANE and N'DAYA and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANTS
#### (Gross Negligence)

545.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 544 above as if more fully set forth at length herein.

546.    The MUNICIPAL DEFENDANTS had a duty to act with reasonable care toward DIANE and N'DAYA.

547.    The MUNICIPAL DEFENDANTS were grossly negligent in causing the aforementioned damages.

548.    The MUNICIPAL DEFENDANTS were grossly negligent in failing to exercise proper supervision and negligently hiring, training and retaining the INDIVIDUAL DEFENDANTS whom they knew, or in the exercise of due care, should have known, (i) were unfit to be entrusted with performing their duties in the VILLAGE and COUNTY; (ii) were unfit to properly handle the obvious risk of the domestic violence situation at 25 ROOSEVELT, undertake a coordinated police response, follow proper police procedures and tactics, timely request back-up officers and medical personal, timely dispatch a hostage negotiation team and BSO units before confronting REED, and (iii) lacked the training and comportment to refrain from entering 25 ROOSEVELT, refrain from recklessly engaging REED, use verbal commands and deescalate dangerous situations, refrain from aggravating dangerous situations, refrain from retreating and  failing to remove DIANE from 25 ROOSEVELT despite the opportunity to do so, refrain from shooting blindly into a house with knowledge that innocent bystanders were within, and refrain from creating a situation such that REED felt death was imminent and there would be no further consequences for murdering DIANE.

549.     The MUNICIPAL DEFENDANTS were grossly negligent in failing to exercise proper supervision and negligently hiring, training and retaining the INDIVIDUAL DEFENDANTS whom they knew, or in the exercise of due care, should have known, would confront domestic violence situations, and could cause greater harm by condoning the acts of abusers and/or inviting reliance on their protection where no protection would be provided.

550.     The INDIVIDUAL DEFENDANTS, while acting in the course and scope of their respective employments by COUNTY and VILLAGE, were grossly negligent in the aforementioned manner.

551.     The gross negligence and grossly negligent acts of the INDIVIDUAL DEFENDANTS, while acting in the course and scope of their respective employments by COUNTY and VILLAGE were the proximate cause of DIANE and N'DAYA's injuries.

552.     COUNTY and VILLAGE are liable for the acts of the INDIVIDUAL DEFENDANTS under the doctrine of *respondeat superior*.

553.     The gross negligence and grossly negligent acts of the MUNICIPAL DEFENDANTS caused DIANE and N'DAYA to suffer and sustain physical pain, suffering and injury, extreme emotional pain, suffering and distress, fear of imminent death, and to otherwise sustain physical and emotional damages.

## AS AND FOR A TWELFTH CAUSE OF ACTION
## AGAINST VILLAGE AND OFFICERS JOHN DOES 1-10
### (Assault)

554.     PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 553 above as if more fully set forth at length herein.

555.     On or about October 30, 2013, OFFICERS JOHN DOES 1-10, acting within the scope of their employment by VILLAGE, entered 25 ROOSEVELT, and OFFICER JOHN DOE

willfully, intentionally and maliciously assaulted N'DAYA in that he had the real or apparent ability to cause imminent harmful and/or offensive bodily contact and intentionally did a violent and/or menacing act that threatened such contact to N'DAYA, and such act(s) caused apprehension of such contact in N'DAYA.

556.    By reason of the aforesaid assault committed against her by OFFICER JOHN DOE, while he was acting within the scope of his employments by VILLAGE, PLAINTIFF suffered and continues to suffer serious injuries and damages.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
#### AGAINST MUNICIPAL DEFENDANTS
(Reckless Infliction of Emotional Distress)

557.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 556 above as if more fully set forth at length herein.

558.    MUNICIPAL DEFENDANTS acted in a shocking and outrageous manner exceeding all bounds of decency by, recklessly and/or intentionally, engaging in the conduct described above including but not limited to failing to enforce mandatory arrest laws, providing assurances to REED, failing to protect DIANE and N'DAYA, placing DIANE and N'DAYA in a position of increased danger, and subjecting DIANE and N'DAYA to REED's campaign of terror, which actions and inactions caused DIANE and N'DAYA severe emotional distress.

559.    In addition, VILLAGE and JOHN or JANES DOES 1-10 acted in a shocking and outrageous manner exceeding all bounds of decency by, recklessly and/or intentionally threatening N'DAYA at gunpoint in October 2013, causing N'DAYA severe emotional distress.

560.    By engaging in the conduct hereinabove described, MUNICIPAL DEFENDANTS intentionally and/or recklessly, and with the intention to cause, or reckless disregard for the possibility of causing, did in fact cause DIANE and N'DAYA severe

emotional distress and acted in a shocking and outrageous manner exceeding all bounds of decency.

561.    MUNICIPAL DEFENDANTS conduct proximately caused DIANE and N'DAYA to suffer and to sustain physical pain, suffering and distress, fear of imminent death, and to otherwise sustain physical and emotional damages.

562.    N'DAYA's emotional damages are continuous and ongoing.

563.    MUNICIPAL DEFENDANTS acted willfully, wantonly, recklessly, negligently, carelessly and/or maliciously, with utter disregard for the health, safety, and well-being of DIANE and N'DAYA.

564.    MUNICIPAL DEFENDANTS proximately caused and permitted the INDIVIDUAL DEFENDANTS, while acting in the scope of their employment, to be placed in a position where they recklessly or negligently caused DIANE and N'DAYA to suffer and to sustain physical pain, suffering and distress, fear of imminent death, and to otherwise sustain physical and emotional damages.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION**
**AGAINST MUNICIPAL DEFENDANTS**
**(Negligent Infliction of Emotional Distress)**

565.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 564 above as if more fully set forth at length herein.

566.    By engaging in the conduct hereinabove described, MUNICIPAL DEFENDANTS negligently caused DIANE and N'DAYA to sustain severe emotional distress.

567.    The INDIVIDUAL DEFENDANTS' conduct, while acting in the scope of their employment by COUNTY and VILLAGE, proximately caused DIANE and N'DAYA to suffer

and to sustain physical pain, suffering and distress, fear of imminent death, and to otherwise sustain emotional damages.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANTS
#### (Wrongful Death)

568.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 567 above as if more fully set forth at length herein.

569.    PLAINTIFF incorporates by reference, the actions (or lack thereof) of MUNICIPAL DEFENDANTS which constituted breach of duties, negligence, gross negligence, recklessness, intentional disregard, callous disregard for the life and well-being of DIANE, and violations of DIANE's statutory and constitutional rights.

570.    MUNICIPAL DEFENDANTS' affirmative course of conduct directly lead to, and/or was a substantial factor in causing, the death, murder, and extreme physical harm suffered by DIANE.

571.    N'DAYA suffered a pecuniary loss and damages by reason of DIANE's death.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
#### (Loss of Consortium and Parental Care)

572.    PLAINTIFF repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 571 above as if more fully set forth at length herein.

573.    DIANE is the mother of N'DAYA.

574.    At all times relevant herein, DIANE maintained custody and care of N'DAYA and provided resources to N'DAYA as her mother and legal guardian.

575.    At all times relevant herein, DIANE maintained custody and care N'DAYA and provided emotional, physical, and all other parental support for this child.

576. At all times relevant herein, DIANE maintained custody and care of N'DAYA, a high school student at the time of DIANE's murder, who resided with DIANE and entirely relied upon, and benefitted from her care.

577. As a result of the actions of the MUNICIPAL DEFENDANTS, DIANE was prevented and/or hindered from caring for and providing support to N'DAYA.

578. As a result of the actions of the MUNICIPAL DEFENDANTS, DIANE is prevented from caring for and/or providing support to N'DAYA, and N'DAYA is thus prevented from receiving and benefitting from that care and support for the rest of her life going forward.

579. At all times, N'DAYA depended on DIANE to take care of her needs, provide her necessities, discipline N'DAYA, provide emotional and motherly support, and supply goods and services that are necessities.

580. Due to the callous, wanton, reckless, negligent, grossly-negligent, careless, and wrongful actions of the MUNICIPAL DEFENDANTS, N'DAYA has been effectively denied, deprived, and prevented from receiving the above-described care from DIANE.

581. That by reason of the foregoing, PLAINTIFF has suffered monetary damages.

## REQUEST FOR RELIEF

WHEREFORE, PLAINTIFF respectfully request that the Court:

(A)    Declare that MUNICIPAL DEFENDANTS' actions violated DIANE and N'DAYA's rights under the U.S. Constitution, the New York Constitution, Title VI of the Civil Rights Act of 1964, and the laws of New York State;

(B)    Enjoin further violations of N'DAYA's rights by issuing an injunction requiring the NCPD and HPD to:

     i.      Abide by laws and policies requiring mandatory arrest for violations of orders of protection;

    ii.      Refrain from unlawful treatment of women, particularly black women;

   iii.      Develop and implement appropriate training for members of the HPD, NCPD, and NCSD in recognizing and responding to domestic violence;

   iv.      Develop and implement appropriate training for members of the HPD, NCPD, and NCSD in coordinating their overlapping systems of policing;

    v.      Develop and implement appropriate training for members of the HPD, NCPD, and NCSD in sensitivity training and cultural competence;

   vi.      Develop appropriate supervisory procedures regarding the treatment of black women who are victims of domestic violence; and

  vii.      Implement policies to increase coordination between HPD and NCPD;

(C)     Issue a judgment against the MUNICIPAL DEFENDANTS in an amount to be determined by a jury, including compensatory damages for injuries sustained by DIANE and N'DAYA in amounts that are fair, just, and reasonable;

(D)     Award PLANTIFF damages against the INDIVIDUAL DEFENDANTS to the extent that their liability is based upon actions that were reckless, willful, wanton, and

maliciously undertaken in their individual capacities, in an amount which is fair, just, and reasonably designed to punish and deter said conduct;

(E)     Order the MUNICIPAL DEFENDANTS to pay the reasonable costs and disbursements of this action, including attorneys' fees pursuant to 42 U.S.C. §1988, and interest from the date of the occurrence; and

(F)     Grant any other relief the Court deems just and proper.

Dated: May 6, 2014
New York, New York

LASASSO LAW GROUP PLLC

By:  /S/ Mariel LaSasso_____
Mariel LaSasso (ML9936)

*Attorneys for Plaintiff*
80 Maiden Lane, Suite 2205
New York, New York 10038
Tel. (212) 421-6000
Fax (212) 421-6006
mariel@lasassolaw.com