🟨 KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** Southerland v. City of New York, 2nd Cir.(N.Y.), May 14, 2012

577 F.3d 415
United States Court of Appeals,
Second Circuit.

Michele OKIN, Plaintiff–Appellant,

v.

VILLAGE OF CORNWALL–ON–HUDSON POLICE DEPARTMENT, Town of Cornwall Police
Department, Rusty O'Dell, Thomas Douglas IV, Michael Lug, Paul Weber, Charles Williams and
Edward Manion, all sued in their individual capacities, and Roy Sears, Defendants–Appellees.

Docket No. 06–5142–cv.  |  Argued: April 28, 2008.  |  Decided: Aug. 18, 2009.

**Synopsis**

**Background:** Alleged domestic abuse victim brought § 1983 action against town and village police departments, as well as individual police officers, alleging that they violated her due process and equal protection rights by failing to respond effectively to her complaints of abuse. The United States District Court for the Southern District of New York, Colleen McMahon, J., 2006 WL 2997296, entered summary judgment for all defendants. Alleged victim appealed.

**Holdings:** The Court of Appeals, Pooler, Circuit Judge, held that:

[1] officers were not qualifiedly immune, and

[2] any failure by officers to effectively respond effectively to reports of domestic violence, if proven, did not violate alleged victim's equal protection rights.

Affirmed in part; reversed and remanded in part.

West Headnotes (24)

**[1]** **Civil Rights** 🗝 Failure to act or protect or to enforce law

**Constitutional Law** 🗝 Creation of danger or risk

Although as a general matter a state's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause, state actors may be liable under § 1983 if they affirmatively created or enhanced the danger of private violence. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

23 Cases that cite this headnote

**[2]** **Constitutional Law** 🗝 Neglect or delay

Though an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would implicate those rights. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

**[3]**      **Constitutional Law**   Neglect or delay

       **Municipal Corporations**   Police and fire

Police officers' alleged irresponsible and insulting behavior in response to reports of domestic violence, including discussing sports with alleged abuser following one report, did not affirmatively enhance risk of violence by making explicit assurances to alleged abuser that he could act with impunity, so as to violate alleged victim's due process rights under state-created danger theory. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[4]**      **Constitutional Law**   Government approval of or acquiescence in private conduct

The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence. U.S.C.A. Const.Amend. 14.

18 Cases that cite this headnote

**[5]**      **Federal Civil Procedure**   Civil rights cases in general

Genuine issue of material fact existed as to whether police officers, in taking alleged actions such as discussing football with alleged abuser during their response to domestic violence complaint, implicitly but affirmatively encouraged alleged domestic violence, precluding summary judgment with respect to state-created danger theory in alleged victim's § 1983 action alleging due process violations. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

9 Cases that cite this headnote

**[6]**      **Civil Rights**   Government Agencies and Officers

       **Civil Rights**   Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

A district court does not necessarily err in addressing a qualified immunity issue by concluding that a right is not clearly established at the time of government officials' actions, without first deciding whether those officials could reasonably be viewed as violating that right; the relevant question is which of the two prongs of the analysis should be addressed first in light of the circumstances in the particular case at hand.

7 Cases that cite this headnote

**[7]**      **Constitutional Law**   Egregiousness; "shock the conscience" test

To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. U.S.C.A. Const.Amend. 14.

39 Cases that cite this headnote

**[8]**      **Federal Civil Procedure**   Civil rights cases in general

Genuine issue of material fact existed as to whether police officers' alleged affirmative creation or enhancement of risk of violence to alleged domestic abuse victim shocked the conscience, precluding summary judgment in alleged victim's § 1983 action alleging substantive due process violations. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

Cases that cite this headnote

**[9]    Constitutional Law**  ☛  Neglect or delay

Deliberate indifference was requisite state of mind for showing that police officers' conduct in allegedly creating or enhancing risk of violence to alleged domestic abuse victim shocked the conscience, as required for alleged victim to prove substantive due process violation. U.S.C.A. Const.Amend. 14.

4 Cases that cite this headnote

**[10]    Civil Rights**  ☛  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

Government actors are entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

50 Cases that cite this headnote

**[11]    Civil Rights**  ☛  Sheriffs, police, and other peace officers

A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity.

24 Cases that cite this headnote

**[12]    Civil Rights**  ☛  Sheriffs, police, and other peace officers

The objective reasonableness test is met, and police officers will enjoy qualified immunity, if the question whether the officers would be violating rights is one on which officers of reasonable competence could disagree; if, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity.

9 Cases that cite this headnote

**[13]    Civil Rights**  ☛  Sheriffs, police, and other peace officers

Once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no qualified immunity defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful.

48 Cases that cite this headnote

**[14]    Civil Rights**  ☛  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

Court of Appeals looks to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right for purposes of qualified immunity.

32 Cases that cite this headnote

**[15]    Civil Rights**  ☛  Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

While officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision, the Court of Appeals may examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights.

1 Cases that cite this headnote

**[16]** **Civil Rights** Sheriffs, police, and other peace officers

State-created danger theory clearly established in 2001 to 2003 that police officers were prohibited from affirmatively contributing to vulnerability of known victim by engaging in conduct, whether explicit or implicit, that encouraged intentional violence against victim, and, thus, officers were not qualifiedly immune from § 1983 action alleging that they violated alleged victim's due process rights by failing to respond effectively to her complaints of abuse. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[17]** **Constitutional Law** Investigation, arrest, or search; selective prosecution

**Constitutional Law** Investigation in general; searches

**Municipal Corporations** Police and fire

Any failure by police officers to effectively respond effectively to female alleged victim's reports of domestic violence, if proven, did not violate her equal protection rights, absent showing that police officers responded differently to complaints of violence that were not domestic in nature, that alleged victim and other women were discriminated against, or that it was alleged victim's gender, and not some other characteristic, that motivated her alleged treatment. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[18]** **Constitutional Law** Intentional or purposeful action requirement

Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

**[19]** **Civil Rights** Governmental Ordinance, Policy, Practice, or Custom

Section 1983 imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights. 42 U.S.C.A. § 1983.

16 Cases that cite this headnote

**[20]** **Civil Rights** Lack of Control, Training, or Supervision; Knowledge and Inaction

A municipality may be found to have a custom that causes a constitutional violation, so as to be liable under § 1983, when faced with a pattern of misconduct it does nothing, compelling the conclusion that it has acquiesced in or tacitly authorized its subordinates' unlawful actions. 42 U.S.C.A. § 1983.

26 Cases that cite this headnote

**[21]** **Federal Civil Procedure** ☞ Civil rights cases in general

Genuine issue of material fact existed as to whether police officers' alleged failure to respond effectively to complaints by alleged victim of domestic violence indicated practice, tacitly endorsed by village, that was so persistent or widespread as to constitute custom or usage with force of law, precluding summary judgment as to whether village and town could be held liable under § 1983 for any due process or equal protection violations by officers. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

5 Cases that cite this headnote

**[22]** **Civil Rights** ☞ Lack of Control, Training, or Supervision; Knowledge and Inaction

Municipal liability under § 1983 may be premised on a failure to train employees when inadequate training reflects deliberate indifference to constitutional rights. 42 U.S.C.A. § 1983.

40 Cases that cite this headnote

**[23]** **Federal Civil Procedure** ☞ Civil rights cases in general

Genuine issue of material fact existed as to whether police officers' alleged failure to respond effectively to complaints by alleged victim of domestic violence indicated failure to train by town and village, precluding summary judgment as to whether town and village could be held liable under § 1983 for any due process or equal protection violations by officers. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

2 Cases that cite this headnote

**[24]** **Civil Rights** ☞ Lack of Control, Training, or Supervision; Knowledge and Inaction
**Federal Civil Procedure** ☞ Civil rights cases in general

A pattern of misconduct, while perhaps suggestive of inadequate training, is not enough to create a triable issue of fact as to municipal liability under § 1983 at the summary judgment stage on a failure-to-train theory; the plaintiff must offer evidence to support the conclusion that the training program was inadequate. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

22 Cases that cite this headnote

**Attorneys and Law Firms**

**\*419** Michael H. Sussman, Goshen, NY, for Plaintiff–Appellant.

Matthew P. Ross, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York, N.Y. (Jamie R. Wozman, on the brief) for Defendants–Appellees Village of Cornwall–on–Hudson Police Department, Thomas Douglas IV, Michael Lug, Paul Weber and Charles Williams.

Edward Lammers, Stecich Murphy & Lammers, LLP, Tarrytown, N.Y. (Marianne Stecich, on the brief) for Defendants–Appellees Town of Cornwall Police Department, Rusty O'Dell and Edward Manion.

Before: STRAUB and POOLER, Circuit Judges. [*]

* The Honorable Sonia Sotomayor, originally a member of the panel, was elevated to the Supreme Court on August 8, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. 46(d); Local Rule 0.14(2); *United States v. Desimone,* 140 F.3d 457 (2d Cir.1998).

**Opinion**

POOLER, Circuit Judge:

Michele Okin appeals from a decision and order of the United States District Court for the Southern District of New York (Colleen McMahon, *Judge* ), entered October 26, 2006, granting defendants' motion for summary judgment. The district court dismissed, as to all moving defendants, Okin's claims that her Fourteenth Amendment rights to due process and equal protection had been violated.

We affirm the grant of summary judgment as to defendants Town of Cornwall, [1] Rusty O'Dell, and Edward Manion. As to Thomas Douglas IV, Michael Lug, Paul Weber, and Charles Williams, we affirm the grant of summary judgment on Okin's equal protection claims. But, with regard to her due process claims, we hold that the conduct of Douglas, Lug, Weber, and Williams raises a genuine issue of material fact as to whether they implicitly but affirmatively sanctioned abuse of Okin by Roy Sears, and that those defendants, if found liable, would not be entitled to qualified immunity. We therefore reverse the grant of summary judgment on the due process claims. Moreover, we reverse the district court's dismissal of Okin's municipal liability claims against the Village of Cornwall–on–Hudson, as Okin raises a genuine issue of material fact as to whether the Village's failure to train its police officers adequately, or the policies and customs that it has sanctioned, caused the individual defendants to violate Okin's due process rights.

[1] The district court substituted the Town of Cornwall and the Village of Cornwallon–Hudson as proper parties, in place of their respective police departments, which Okin had initially named in her complaint. *Okin v. Cornwall–On–Hudson Police Dep't.,* No. 04 Civ. 3679, 2006 U.S. Dist. LEXIS 75881, at *34–35, 2006 WL 2997296, at *12 (S.D.N.Y. Oct. 13, 2006). As Okin did not object to this decision, we follow suit. The Clerk's Office is directed to change the caption by substituting the Town of Cornwall and the Village of Cornwall–on–Hudson as proper parties, in place of their respective police departments.

## BACKGROUND

Plaintiff-appellant Michele Okin began a relationship with Roy Charles Sears in 1999. [2] Okin and Sears moved in together, **\*420** living in a house owned by Sears at 11 Taft Place, in the Village of Cornwall–on–Hudson, New York. They are the parents of twin children, born in May 2001. In the same year, according to Okin, Sears began to abuse her physically. Okin alleges that Sears was well known to local police officers with whom he socialized at a tavern of which he was part owner, the Leprechaun Inn, and she claims that Sears often bragged that he could get away with what he wanted in Cornwall.

[2] We take the facts from the district court opinion and from the record below, viewing the evidence in the light most favorable to Okin, against whom summary judgment has been granted, as required when we review a grant of summary judgment. *See, e.g., Horvath v. Westport Library Ass'n.,* 362 F.3d 147, 151 (2d Cir.2004).

According to Okin, Sears injured both her hands in October 2001, fracturing bones in her left hand and right index finger. She did not report this incident to the police and, according to her Affidavit in Opposition to Defendants' Motion for Summary Judgment, she begged her primary care physician "not [to] tell anyone or record this on her records" because she "was in fear of [her] life and felt Sears was beyond the law."

Thereafter, however, Okin repeatedly called for police assistance. Nevertheless, neither the Village of Cornwall–on–Hudson Police Department nor the Town of Cornwall Police Department [3] arrested Sears or interviewed him at any length regarding Okin's allegations of abuse. Only one domestic incident report was filed.

[3]     Cornwall–on–Hudson lies entirely within Cornwall, but has its own police department. The two departments share a dispatcher. If a 911 call to that dispatcher concerns an incident in Cornwall–on–Hudson, the Village police are dispatched, if available; otherwise, the Town police are sent, provided that the incident occurred in Cornwall.

The first reported violence occurred on December 23, 2001. Okin called 911 following an incident in which, according to Okin, Sears grabbed her neck and started to choke her. Okin testified at a deposition that she placed three calls to the dispatcher before Village of Cornwall–on–Hudson Police arrived at 11 Taft Place. Okin said to defendant Thomas Douglas IV, a Village of Cornwall–on–Hudson Police officer, "Can you please tell Roy to stop beating me. That is all I want." In her bedroom, Okin showed Douglas bruises on her legs, which, according to Douglas's incident report, "looked very old and in the process of healing." At her deposition, Okin could not recall exactly when she sustained the leg injuries, but testified that Sears was at that time "hitting [her] every single day."

According to Douglas's incident report, Okin said that Sears had told her that he had had a conversation with defendant Charles Williams, the Village of Cornwall–on–Hudson Police Chief, in which Sears told Williams that he could not "help it sometimes when he smacks Michele Okin around" and that Okin was "a terrible mother and should have an order of protection against her own kids." According to Douglas, Okin said that she then tried to call the police, but that Sears stopped her by grabbing her neck. Douglas added that he did not "observe any redness nor markings around her neck." He also added that Okin "couldn't keep still and her mental status was very awkward," and that she told him she was "a manic depressant [sic] and also has panic attacks, and sees a psychiatrist." According to Douglas, Okin repeatedly said she did not want to press charges and left the bedroom despite his request that she stay in the bedroom while he spoke separately with Sears.

Defendant Edward Manion, a Town of Cornwall police officer, arrived in a backup capacity. Okin also showed him the bruises on her legs. According to Manion, Sears denied inflicting the bruises. At his deposition, Manion testified that he too believed they were "old" bruises, and that this was the reason he did not arrest Sears, suggesting that he believed that **\*421** immediate arrest was mandatory only if the injury was very recent. He and Douglas did not discuss the bruises or the possibility of arresting Sears.

Holding one of the infants, Okin said "I better stop the kid from crying or I am going to get beat." According to Douglas, he and Manion told Okin that "if she is being assaulted she needs to call the police then, not days or weeks later." Okin, however, recalls that she retorted that Sears had that very day thrown a baby's bottle at her and one of their children and had tried to choke her.

Douglas further reported that, when Okin heard Sears getting ready to leave the house with the children, she said, "Roy is going to take the kids and never come home" and that she wanted to press charges. According to Douglas, Manion told Okin "what she needed to do in order to press charges," but "in the middle of describing the procedure to Michele, she just walked away" and joined Sears outside, before coming back inside and saying she did not want to press charges. Okin was "given a domestic incident report, and advised about [a telephone] help number to call for counseling." Meanwhile, Sears announced that Okin was on medication that made her sleep and that she therefore could not take care of the children. Douglas concluded that no offense had been committed.

Douglas prepared a domestic incident report, which Okin signed. The domestic incident report indicates by check-mark that the "[c]ircumstances of [t]his [c]ase" included "[f]orcible [r]estraint," "[g]rabbing" and "[t]hrowing [i]tems." The report states, among other things, that Okin alleged that she had been beaten by Sears and was afraid that her children would be too, that Okin was "on medication," and that she "refused to sign charges." Okin claims that, at the time she signed the report, it did not indicate that she did not want to press charges. Douglas wrote "[b]ruises" next to the box for "[i]njuries" on the domestic incident report, but he did not interview Sears about the bruises. Indeed, Okin, disturbingly, alleges that, to the extent that the

officers talked with Sears, it was about football. Moreover, according to Okin, the officers were "very derogatory" toward her when she said she wanted to press charges, and *this* was why she walked away from them. [4] Sears was not arrested.

[4]     According to Okin, she went to the police station to press charges the next day.

According to Okin, on January 1, 2002, she called the police to report that Sears was beating her. Defendant Paul Weber, a Village of Cornwall–on–Hudson Police Department sergeant, responded to 11 Taft Place, but made no written report and according to Okin, laughed at her for making the complaint. Around this time, Sears moved out of 11 Taft Place and took up residence at a Days Inn motel, in nearby New Windsor.

On February 8, 2002, Okin again called the police for assistance. Nonparty police officer John Pena responded, and found an angry Sears at 11 Taft Place. Sears told Pena that Okin had "removed $105,000.00 from his personal checking account" without his consent. Sears said he had come to the house to retrieve his check books. Police Chief Williams and nonparty police officer Jill Nye arrived, and Williams asked Sears to follow him to headquarters in order to provide further information. Sears spent about an hour in Police Chief Williams's office, as the police chief tried to assess "[t]he validity and substance" of Sears's complaint.

Meanwhile, at 11 Taft Place, according to police officer Nye's report, Okin "appeared to be distraught and confused **\*422** [about] the reason [the police officers] were there. Several attempts were made to convey the facts. Ms. Okin repeatedly brought up prior incidents related to domestic violence." During their conversation, Okin admitted taking the $105,000, but insisted Sears had given her permission to remove the money for their children. Nye reported that "Ms. Okin made several attempts to show signs of abuse," but that she, Nye, "did not observe any markings on her person." Nye also noted that Police Chief Williams advised Sears to stay away from 11 Taft Place.

On March 8, 2002, Sergeant Weber responded to 11 Taft Place after a 911 call from Okin reporting a stabbing. Okin told the dispatcher that Sears had "pushed her around" and that she was afraid that he would hurt her when he returned to the house. According to Weber's incident report, Okin did not answer the door until he got the dispatcher to call Okin back, and did not seem upset when she appeared at the door. Okin denies this.

Weber's incident report appears internally inconsistent on its face. The report states both that Weber learned that "no assault had occurred and no stabbing had occurred" and that Okin told him that Sears had assaulted her the previous night at the Days Inn in New Windsor. At his deposition, Weber explained the inconsistency by saying that Okin was complaining that she had been stabbed in her feet but, when he asked to see the wounds, she took her shoes off and there were no visible injuries. Okin's March 25, 2006 Affidavit in Opposition to Defendants' Motions for Summary Judgment states that she showed Weber stab wounds on her feet, but her Reply to Village Defendants' Local Rule 56.1 Statement, also dated March 25, 2006, "denies that she showed Weber her feet or that she claimed to be stabbed that evening in conversation with him."

Weber, after noting that he had told Okin that the New Windsor matter was outside his jurisdiction, added the following comments about Okin to his incident report:

> As she was ranting about the police "refusing" to help her (even though she is an attorney and should understand jurisdiction more than anybody), she began complaining about "Officer Weber" and that he blatantly refused to entertain her complaint on one of the previous occassions [sic] that she called and the police responded to her house. This is the first that I have been to her residence to handle any such complaint. She is obviously confused.

He then added, "It should also be noted that the interior of the house appears to be in disorder. It is unknown if she is able to maintain the residence." [5]

[5]    We cannot let these remarks go by without noting that the tone of Sergeant Weber's reports, at least on paper, appears frequently sarcastic and disdainful, and falls far beneath the level of professionalism expected of a police officer.

At her deposition, Okin testified that she had asked Weber to arrest Sears on this occasion, and that he had refused. Although Weber filed a general incident report, he did not file a domestic incident report. Nor did he notify Okin that she could initiate a civilian arrest.

On March 25, 2002, Okin called 911 and requested to speak with an officer. Nonparty police officer Arthur Terwilliger called Okin back, and Okin told Terwilliger that Sears had threatened to damage 11 Taft Place and to kill her, and that he was at the Days Inn in New Windsor. Terwilliger asked Okin if she wanted to sign a complaint, but she refused, saying "No, that is going to make the situation worse." Terwilliger asked Okin for descriptions of Sears's cars and promised to patrol the **\*423** Taft Place area frequently that evening. No domestic incident report was filed. At his deposition, Terwilliger testified that he had had no specific training on handling a situation in which a threat victim says that filing a complaint will just make things worse.

On the same day, Pam Cobey, an employee of Okin's, reported to the Village of Cornwall–on–Hudson Police Department that someone had left a post-it note in Okin's office mailbox that read "M.O. [Michelle Okin] Sleep with one [eye] open at night." Cobey brought the post-it note to the police.

Late that night, March 25, 2002, Okin called 911, reporting a prowler outside 11 Taft Place. She told the Cornwall–on–Hudson dispatcher about the death threat from Sears and about the post-it note, which she identified as being in Sears's handwriting. Again, Sergeant Weber was dispatched to the house but, on learning which officer had been sent, Okin told the dispatcher she did not want Weber to respond.

Weber writes that he "responded anyway and checked the exterior of the residence. No problems." Weber adds,

> After returning back to police HQ, the phone rang. It was Ms. Okin. The first thing she was advised of was that whatever problem she had with me, she was obviously confusing me with another officer. She apologized. She then went on complaining that the police never do anything when she calls. After a lengthy conversation, she was advised that if she wanted to pursue charges on any complaint that she has that she would have to respond to police HQ just like anyone else. She continued to complain about Roy Sears and I advised her again that if he is so violent towards her, it would obviously be in her best interest to stay away from him. She was also advised that if she felt threatened just knowing that Roy is around, ... she could pursue the matter in family court and try to seek an order of protection. She refused to try and pursue it.

No domestic incident report was completed.

Okin called the police again, on April 12, 2002, very distraught, and complained that Sears was stalking her, outside 11 Taft Place. Nonparty police officer Charles Hofmann responded and checked the area around the house, finding no suspicious activity. Again, the police did not interview Sears.

On May 12, 2002, Okin went to see Sears at the Days Inn, where he was residing, and the two quarreled. They then returned together (albeit in separate cars) to 11 Taft Place. There, they quarreled again, and, according to Okin, Sears kicked Okin in the leg. At some point, Sears turned off the power in the house. A neighbor, Barbara Corwin, heard the commotion and saw Sears and Okin "burst out of the door from the house into the garage ... yelling at each other." The shouting match in the garage lasted for several minutes. However, Corwin did not see Sears strike Okin. Feeling that the situation was nonetheless "threatening-looking," Corwin called 911 and defendant Michael Lug, a Village of Cornwall–on–Hudson police officer, was dispatched to 11 Taft Place. By the time he arrived, Sears had left.

Lug found Okin outside the house. Okin told him she had fallen and was in pain. She also said that Sears had "cut the power and the phone lines." Lug discovered that the house's master circuit breaker had been switched off, but restored the electricity and found the phones in working order. Okin told Lug that Sears had kicked her leg, punched her, and slapped her, and that she would go to her doctor the next day to find out if her **\*424** leg was broken. She said that Sears had asked her, "Are you going to [the] police, bitch?" Lug told Okin he was going to "complete a report," and he notes that she said, "I'm not going to sign it." But Okin insists that she did not say this. Lug filed no domestic incident report, did not arrest or interview Sears, and did not advise Okin that she could initiate a civilian's arrest. The incident report gives "0" as the number of victims and as the number of suspects. Lug also did not interview Corwin, the neighbor.

Okin claims that, on May 13, 2002, Sears pinched her on the back while the two were at his attorney's office, in Cornwall, and raised his hand to her in the lawyer's presence. She called the police, and nonparty police officer Jill Nye went to 11 Taft Place. Nye informed Okin that she would have to contact the Town of Cornwall police, since the incident at the lawyer's office had occurred in the Town of Cornwall, not the Village. Nevertheless, officer Nye did look at Okin's back. She reports that she did not see "any marks resembling bruising or injury." Nye asked Okin if she would like medical attention, and notes that Okin declined.

On May 19, 2002, Okin called the police regarding an incident that had occurred the previous day. Sergeant Weber responded to 11 Taft Place, and Okin told him that Sears had come to the house, threatened to shoot her, and threatened to report her to child protective services. According to Weber, he "asked Okin if she wanted to pursue the 'shooting threat' and she said no, she was more concerned with the cps [child protective services] threat." Okin strongly denies saying she did not want to pursue the shooting threat or have Sears arrested.

Weber's report states that Okin "then started going off on tangents about subjects like Sears leaving the garage door open and her broken hands. I advised her that those aren't issues that the police can handle." Weber's report notes that "[i]t is unknown why [Okin] didn't call the police when the incident occurred but instead elected to wait until the next day to report it." The incident report gives "0" as the number of victims and as the number of suspects. Weber again did not file a domestic incident report. Sears was not interviewed about the threat.

On June 3, 2002, Okin called the police, saying that she wanted a report taken. When nonparty John Pena, a Village of Cornwall–on–Hudson Police Department police officer, arrived at 11 Taft Place, Okin reported that appliances in her house—microwave, water heater, garage door—were breaking and light bulbs needed replacing, and that Sears was responsible. Okin also told Pena that Sears had told her that he had thrown rocks at 11 Taft Place. Finally, she reported that she had found two boxes of her jewelry in Sears's car. Pena filed an incident report. [6]

[6]     Two Town of Cornwall officers were dispatched in a backup capacity, but Pena handled the complaint.

On November 2, 2002, Okin again contacted the police. Nonparty police officer Arthur Terwilliger and another officer responded. Okin complained to Terwilliger that, two days previously, she had returned home to find "the door slightly open" and its lock malfunctioning. Terwilliger asked her if anything was missing, and she responded that she had not had time to check yet. Terwilliger advised Okin to call the Village Police Department if she noticed anything missing "and also next time to call [the Police] department as soon as an incident happens."

 **\*425**  On November 15, 2002, Okin called the police and spoke with nonparty Christopher Park, a Village of Cornwall–on–Hudson Police Department police officer. Okin was afraid that Sears was going to evict her from 11 Taft Place. Park informed Okin that she should pursue the matter in civil court. She said she was going to get an order of protection. A few minutes later, officer Park received a call from Sears himself, and Park told Sears as well that eviction was a matter for the civil authorities. On November 18, 2002, a similar conversation played out between Park and Sears in person.

On November 15, 2002, Okin, on her way to get an order of protection against Sears, spoke with defendant Rusty O'Dell, the Town of Cornwall Police Chief, telling him that the Village of Cornwall–on–Hudson police had failed to protect her or follow

up on her domestic violence complaints. O'Dell promised that this would not happen on his watch, and discussed with Okin the possibility of her getting an order of protection. Okin then successfully brought a petition in Orange County Family Court seeking an order of protection.

On January 16, 2003, Okin called the police with a report that a rental car had been stolen from her driveway. Sergeant Weber responded, finding Okin at 11 Taft Place along with a friend, Patrick Coviello. Weber reports that he tried to get information concerning the missing vehicle, but that Okin "continued to go off on tangents." Weber says he told Okin that he was not there "in reference to all of the other non-relevant information" and that she should focus on the missing car matter, to which Coviello retorted, "She is trying to explain it to you!" Weber recalls that Coviello then said to Okin that they should call the State Police "as if this officer wasn't capable of handling the complaint." Weber adds that "in trying to avoid a confrontation, [he] put [his] pen away and stated, 'Then call the state police.' " Weber then left the residence and noted that the state police handled the matter.

On January 20, 2003, Okin's employee Rhonda Fall thought she saw Sears parked in a sports-utility vehicle across the road from Okin's office, and then saw him drive off fast. After talking with Fall, Okin called the police again. Police officer Terwilliger responded. Terwilliger took a statement from Fall, and advised Okin that the Village Police Department would "bring this information before the judge to see if we have enough to pursue the matter."

Okin also called the State Police, who then spoke with Sergeant Weber. Weber wrote:

> It appears that Ms. Okin is engaging in a sort of forum shopping wherein she calls agency after agency until she finds one that will pursue her complaints (usually against Mr[.] Sears).... It is unknown at this time what motive she has for claiming Mr[.] Sears as the 'suspect' in every negative event (both reported and unreported) that occurs in her life. As for this latest complaint, the witness in this case [i.e. Fall] does not know Roy Sears and, after being interviewed by Officer Terwilliger, she stated only that it "appeared" to be him ... from a photo later shown to her by Ms. Okin. The witnesses [sic] only other evidence is that there was a "fat man" sitting in a white SUV. That is not enough probable cause to arrest Mr. Sears.

On March 13, 2003, Sears and Okin appeared in Town of Cornwall Justice Court in regard to an eviction action brought by Sears against Okin with respect to 11 Taft Place. According to Okin, Sears threatened both her and her attorney on this occasion, saying that he was going to "get **\*426** her outside." At his deposition, Okin's attorney testified that Sears threatened him, telling him that he was going to "get" him.

That evening, Okin and her friend Patrick Coviello called the police to report Sears's threats. The Village of Cornwall–on–Hudson Police Department told them the matter was not within its jurisdiction. Okin and Coviello then went to the Town of Cornwall Police Department and showed defendant police officer Manion the order of protection and told him about Sears's threats. The Town Police Department refused to arrest Sears or, as Manion recalled, refused to arrest him that night. Manion wrote up an incident report.

The following day, Okin called Town of Cornwall Police Chief O'Dell to discuss the courtroom incident. O'Dell followed up by calling the Clerk of the Town of Cornwall Justice Court, Lynn Tucci, who told him that she had not seen any harassment of Okin by Sears, although Sears was "disorderly" with the Town Justice in court. O'Dell reported that he left three messages for Coviello, [7] but that Coviello did not return his calls. A month later, O'Dell asked the Town Justice about the incident, and the latter could recall nothing.

[7]     Okin did not produce evidence to contradict this and Coviello has since died.

Okin filed a 42 U.S.C. § 1983 action, on May 14, 2004, in the Southern District of New York, alleging violations of her federal Due Process and Equal Protection rights by individual officers of the Town of Cornwall and Village of Cornwall–on–Hudson police departments, and by the police departments themselves. By failing to arrest or even interview Sears, Okin alleges that

defendants endangered her by emboldening Sears. Okin also alleges that defendants "acted in concert with Sears," that they failed to respond effectively to her repeated complaints about Sears because he "had significant personal relationships with ranking members of [the Village and Town] police departments and made financial contributions to or at the behest of the Town Police Department," [8] and that defendants' dismissive and inappropriate behavior which was witnessed by Sears affirmatively increased the danger she faced. The defendants filed a summary judgment motion, the individual officers moving for summary judgment on the grounds of qualified immunity.

[8]     Town of Cornwall Police Chief O'Dell has testified that he would not recognize Sears if he saw him, has never spoken with him on the phone, does not know what he does for a living, and is unaware of whether he had made contributions to the Town of Cornwall Police Department. Manion met Sears at the Leprechaun Inn, knew Sears co-owned it, and was introduced to Okin by Sears at the inn. Manion has testified that he received no free food or drinks there, and was unaware of Sears's donations to the Police Benevolent Association, or that Sears sponsored events in the community with which the police departments were associated.
    Village of Cornwall–on–Hudson Police Chief Williams testified that he has met Sears, encountering him for the first time when Sears sought permission from the Mayor to "drop the ball at the Village Square on New Year's Eve." He testified that only after the initiation of Okin's lawsuit did he learn that a company with which Sears was associated had donated aluminum to help the Village make a cage for the Police Department's first canine vehicle and that Sears allowed a police canine school to use a building he owned for practice. Lug and Weber insisted they knew of Sears, but did not know him personally.

The district court first considered Okin's claim based on the state-created danger theory that defendants violated her rights under the Due Process Clause. The district court summarized the state-created danger theory as requiring that "a plaintiff ... show some contact between the defendant police officers and the private wrongdoer through which explicit or implicit sanction [of violence] was communicated." **\*427** *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*44, 2006 WL 2997296, at \* 16. The district court remarked

> [T]he court cannot help but observe that, even if I were to view the officers' version of events as true (which I cannot, for purposes of this motion), their conduct in the face of Okin's complaints ranges from insensitive to incomprehensible, and evidences either a lack of training or a lack of comprehension about the realities of domestic violence.
>
> ...
>
> Viewed in the light most favorable to the plaintiff, the evidence shows that she complained repeatedly about domestic violence over a fifteen-month period, and that moving defendants repeatedly treated her with indifference or disdain, failed to advise her of her rights as a domestic violence victim or even to characterize the incidents as domestic violence.

*Okin,* 2006 U.S. Dist. LEXIS 75881, at \*35, 45, 2006 WL 2997296, at \*13, 16.

The district court nonetheless granted summary judgment to defendants on Okin's due process claims. The district court ruled that a reasonable jury could not find an "explicit facilitation violation on the most plaintiff-favorable view of the facts of this case." *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*44–45, 2006 WL 2997296, at \*16. As to implicitly sanctioned violence, the district court found that "the individual defendants here ... would be entitled to qualified immunity, even if they implicitly facilitated Sears' abuse by not arresting him or closing out Okin's numerous complaints almost as soon as they were opened." *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*49, 2006 WL 2997296, at \*17. The district court also granted summary judgment to defendants as to Okin's claims for violations of the Equal Protection Clause and for municipal liability. *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*66–70, 2006 WL 2997296, at \*23–24. Okin timely appealed.

## STANDARD OF REVIEW

"A district court's grant of a summary judgment motion is subject to de novo review. All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party." *Horvath,* 362 F.3d at 151 (citation omitted). Summary

judgment is appropriate only where "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

**DISCUSSION**

### I. Okin's Due Process Claims

Okin alleges that defendants "acted in concert with defendant Sears and permitted him to impose his reign of terror and abuse upon [her], in violation of her right to due process," by failing to acknowledge and to investigate her complaints against Sears even where he had admitted to Police Chief Williams that "he smacked Okin around and could not stop himself from behaving in this manner," failing to report her complaints accurately, failing to provide her reasonable police protections, and otherwise failing to discharge their duties as law enforcement agents. More specifically, Okin asserts that, by expressing contempt toward her and by condoning Sears's conduct, in particular by such actions as discussing sports with him following Okin's December 23, 2001 emergency call, defendants gave official sanction to Sears's abuse and affirmatively contributed to her vulnerability.

### A. The State–Created Danger Doctrine

 [1]    [2]    Although "[a]s a general matter ... a State's failure to protect an individual  **\*428**  against private violence simply does not constitute a violation of the Due Process Clause," *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence. *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). "[T]hough an allegation simply that police officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights." *Dwares,* 985 F.2d at 99.

In *Dwares,* we vacated a district court's Federal Rule of Civil Procedure 12(b)(6) dismissal of the Section 1983 claims of a demonstrator who alleged he had been beaten by skinheads. The plaintiff alleged that defendant police officers had assured the skinheads that "unless they got completely out of control the police would neither interfere with their assaults nor arrest them," thus indicating that they could assault the demonstrators. *Id.* at 97. As Judge Kearse put it, "[i]t requires no stretch to infer that such prior assurances would have increased the likelihood that the 'skinheads' would assault demonstrators." *Id.* at 99. The plaintiff also "alleged that the officers had in effect aided and abetted the deprivation of [his] civil rights by allowing him to be subjected to the prolonged assault in their presence without interfering with the attack." *Id.* Based on the allegations that police officers communicated to private actors that they had the freedom to harm others without risk of a law enforcement response, we found that "[s]uch a prearranged official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." *Id.*

In later cases, we read *Dwares* to establish that the Due Process Clause may be violated when police officers' *affirmative* conduct —as opposed to *passive* failures to act—creates or increases the risk of private violence, and thereby enhances the danger to the victim. In *Hemphill v. Schott,* 141 F.3d 412 (2d Cir.1998), for example, we found a material issue of fact as to whether police officers encouraged a private actor's violence against the plaintiff, where the officers, who were called to the scene of a drugstore robbery, allowed the store's manager to join them in pursuit of the plaintiff after returning the manager's gun, which the manager then used to shoot the plaintiff. *Id.* at 418–19. As we summarized our holding in *Dwares,* "where the state actors actually contributed to the vulnerability of the plaintiff, or where the state actors aided and abetted a private party in the deprivation of a plaintiff's civil rights, a violation of the Due Process Clause does occur." *Id.* at 419.

Since *Dwares,* we found that repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute "prior assurances," *Dwares,* 985 F.2d at 99, rising to the level of an affirmative condoning of private violence,

even if there is no explicit approval or encouragement. *Pena v. DePrisco,* 432 F.3d 98, 111 (2d Cir.2005). In *Pena*—also a 12(b)(6) analysis—we held that

> when, as the plaintiffs allege, state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct under *Dwares.* **\*429** This is so even though none of the defendants [is] alleged to have communicated the approval explicitly.

*Pena,* 432 F.3d at 111. We held that the Due Process Clause could be violated by police officers' implicit message that they condoned an off-duty officer's act of driving-while-intoxicated, where his drunken driving resulted in multiple deaths. *Id.* at 111 ("[T]o the extent that fellow police officers and some supervisors participated in or condoned [the off-duty police officer's] behavior, and even ... invited [the officer] to drive after drinking heavily, it could be inferred by a reasonable juror that those defendants, by their actions, implicitly but affirmatively condoned [the officer's] behavior and indicated to [the officer] that he would not be disciplined for his conduct.")

 **[3]**    **[4]**    Here, we agree with the district court that Okin has failed to show a genuine issue of material fact as to whether defendants affirmatively enhanced the risk of violence by making explicit assurances to Sears that he could act with impunity. As the district court noted, even the most irresponsible and insulting behavior alleged by Okin, such as the officers' discussing sports with Sears on December 23, 2001, does not amount to explicit assurances to an aggressor that he will not be impeded or arrested. Yet, as is clear from *Dwares, Hemphill*, and *Pena,* explicit approval of violence is but a subset of the affirmative conduct by state actors that can enhance the danger to a victim. The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence. *Pena,* 432 F.3d at 111; *Hemphill,* 141 F.3d at 419; *Dwares,* 985 F.2d at 99.

 **[5]**    The district court did not consider whether a reasonable trier of fact could find that defendants' behavior enhanced the danger to Okin by implicitly but affirmatively encouraging or condoning Sears's domestic violence. As will be discussed further below, the *Pena* court held that a state actor's implicit encouragement of drunk driving, while actionable misconduct under the state-created danger theory, was not a clearly established violation of the Due Process Clause at the time of the defendants' actions, so that under principles of qualified immunity, they could not be held individually liable. *Pena,* 432 F.3d at 102, 114–15. The district court, following *Pena,* found that "the individual defendants here—just like the individual defendants in *Pena*— would be entitled to qualified immunity, even if they implicitly facilitated Sears' abuse by not arresting him or closing out Okin's numerous complaints almost as soon as they were opened." *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*49, 2006 WL 2997296, at \*17.

 **[6]**    Although the district court did not address the question of whether defendants violated the Due Process Clause by implicit encouragement of Sears's domestic violence, the record is sufficient for us to rule on the issue.[9] Viewing the evidence in the light most favorable to Okin, we find **\*430** a genuine issue of material fact as to whether defendants implicitly but affirmatively encouraged Sears's domestic violence. A reasonable factfinder, as Okin argues, could infer that defendants' actions, such as discussing football with Sears during their response to Okin's complaint that he had beaten and tried to choke her, "plainly transmitted the message that what he did was permissible and would not cause him problems with authorities." Moreover, the evidence suggests that the defendants repeatedly communicated to Sears that his violence would go unpunished, as when Sears told Williams that he could not "help it sometimes when he smacks Michele Okin around" and Williams made no arrest, and also, on the numerous occasions that defendants responded to Okin's complaints without filing a domestic incident report, interviewing Sears, or making an arrest. A reasonable view of the evidence supports the inference that defendants' actions rise to the level of affirmative conduct that created or increased the risk of violence to the victim. *Pena,* 432 F.3d at 111; *Dwares,* 985 F.2d at 99.

9    The question of whether the officers' conduct violated a constitutional right is the first step of the qualified immunity analysis set forth in *Saucier v. Katz,* the second step being whether the right is clearly established. 533 U.S. 194, 201, 207–08, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In *Pearson v. Callahan,* the Supreme Court reconsidered *Saucier's* two-step procedure for resolving the issue of qualified immunity. ––– U.S. ––––, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The Court held that "the sequence set forth [in *Saucier* ] is often appropriate, [but] it should no longer be regarded as mandatory," id. at 818, 129 S.Ct. 808, and that "courts should have the discretion to decide whether [the *Saucier]* procedure is worthwhile in particular cases." *Id.* at 821, 129 S.Ct. 808. Accordingly, a district court does not necessarily err in addressing a qualified immunity issue by concluding that a right is not clearly established at the time of a government officials' actions, without first deciding whether those officials could reasonably be viewed as violating that right. *See Pearson,* 129 S.Ct. at 818, 129 S.Ct. 808. *Saucier* has been overruled to the extent it had required that "a qualified immunity defense ... be considered in proper sequence," 533 U.S. at 200, 121 S.Ct. 2151, but it remains good law where it is appropriate for the two-step procedure to be applied.

The relevant question after *Pearson* is "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S.Ct. at 818. *Pearson* recognized the continuing importance of the two-step procedure for cases where "it ... may be difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be." *Id.* (quotation marks and alteration omitted); *see also Saucier,* 533 U.S. at 207, 121 S.Ct. 2151 (noting that "the procedure permits courts in appropriate cases to elaborate the constitutional right with greater degrees of specificity"). In this case, the application of *Saucier*'s two-step procedure is appropriate. Because we are called upon to determine whether the right to be free from a state actor's implicit but affirmatively created danger was clearly established at the time of defendants' actions, it is necessary to articulate the nature of the claimed violation in this case.

The record demonstrates an escalating series of incidents that followed the officers' response to Okin's first complaint of domestic violence, where the officers and Sears had discussed sports, and the officers openly expressed camaraderie with Sears and contempt for Okin. The officers' conduct, both in response to that first complaint and thereafter, could be viewed as ratcheting up the threat of danger to Okin. *See Hemphill,* 141 F.3d at 419 (finding that a due process violation may occur if the defendants "actually contributed to the vulnerability of the plaintiff"); *see also Koulta v. Merciez,* 477 F.3d 442, 446 (6th Cir.2007) (explaining that the increased risk of violence turns on "whether [the victim] was safer before the state action than he was after it") (quotation marks omitted); *Munger v. City of Glasgow Police Dep't.,* 227 F.3d 1082, 1086 (9th Cir.2000) (stating that officers' affirmative conduct endangers a victim if it "left the person in a situation that was more dangerous than the one in which they found him"). Okin would be more vulnerable once Sears was aware of the officers' dismissive and indifferent attitude toward Okin's complaints, as such awareness nullifies the deterrent capacity of police response. The implied message of the officers' conduct may have galvanized Sears to persist in violent encounters with Okin. A reasonable factfinder undoubtedly could conclude that defendants, by their affirmative conduct, enhanced the danger to Okin because they conveyed to Sears that he could continue to engage in domestic violence **\*431** with impunity, and that defendants thus violated Okin's due process rights.

## B. State Action That "Shock[s] the Contemporary Conscience"

 **[7]**    To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Matican v. City of New York,* 524 F.3d 151, 155, 158–59 (2d Cir.2008). *Lewis* declared that intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level," 523 U.S. at 849, 118 S.Ct. 1708, that "negligently inflicted harm is categorically beneath the threshold of constitutional due process," *id.* at 849, 118 S.Ct. 1708, and that recklessly inflicted harms are context-dependent "closer calls." *Id.* In discussing the latter, the Court in *Lewis* noted that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Id.* at 850, 118 S.Ct. 1708. The Court specifically distinguished the circumstances of a high-speed chase that tends to show the absence of conscience-shocking conduct from situations, as in the care of prison inmates, when the opportunity for deliberation is typically available. *Id.* at 851, 118 S.Ct. 1708; *see also Matican,* 524 F.3d at 158–59; *Pena,* 432 F.3d at 113.

In *Pena,* we found

that the alleged behavior of the ... defendants ... over an extended period of time and in the face of action that presented obvious risk of severe consequences and extreme danger, falls within the realm of behavior

> that can properly be characterized as ... conscience shocking, in a constitutional sense.... [I]f the plaintiffs' allegations are accurate, it was not only feasible, it was obligatory, for the defendants to avoid tacitly encouraging [drunk driving].

432 F.3d at 114 (quotation marks and citations omitted) (third ellipses in original). In *Matican,* on the other hand, we determined that the officers' use of force against a drug dealer during a sting operation, which may have revealed the identity of an informant who was later assaulted by the drug dealer, did not shock the conscience because the officers were faced with the "competing obligations" of protecting their safety and that of the informant. 524 F.3d at 159. *Matican* thus found that the officers' judgment was entitled to deference. *Id.*; *see also Lewis,* 523 U.S. at 853, 118 S.Ct. 1708.

 **[8]**     **[9]**     We find the record in this case to support the conclusion that Okin raises a genuine issue of material fact as to whether the defendants' affirmative creation or enhancement of the risk of violence to Okin shocks the conscience. The serious and unique risks and concerns of a domestic violence situation are well known and well documented. [10] The officers' awareness  **\*432**  of the serious consequences of domestic violence is further supported by their training and their knowledge of New York law on domestic violence. To the extent that the police officers were *not* aware of the seriousness of domestic violence, this reflects a deficiency in the officers' training, an issue we discuss *infra.* Given that domestic violence is a known danger that the officers were prepared to address upon the expected occurrence of incidents, the officers who responded to Okin's complaints had ample time for reflection and for deciding what course of action to take in response to domestic violence. *Cf. Lombardi v. Whitman,* 485 F.3d 73, 83 (2d Cir.2007). This is a case where deliberate indifference is the requisite state of mind for showing that defendants' conduct shocks the conscience. *See Lewis,* 523 U.S. at 851, 118 S.Ct. 1708.

[10]     The statistics demonstrate that domestic violence remains dangerous, serious and prevalent. Between 1976 and 2005, 30% of homicides of women were known to have been committed by intimate partners. U.S. Bureau of Justice Statistics, U.S. Dep't of Justice, *Intimate Partner Violence in the U.S., Victim Characteristics, available at* http://www.ojp. usdoj.gov/ bjs/intimate/victims.htm (last visited Mar. 6, 2009); S.Rep. No. 102–197, at 38, 1991 WL 231548 (1991) ("For a host of reasons—including fear of retaliation and the lingering stigma of sex crimes and violence in the home—vast numbers of these crimes are left unreported to police or other authorities. Both literally and figuratively, these crimes remain hidden from public view."). In addition, domestic violence cases demand a careful and sensitive approach. *See* Don Dutton & Susan Lee Pointer, *Traumatic Bonding: The Development of Emotional Attachments in Battered Women on Other Relationships of Intermittent Abuse,* 6 VICTIMOLOGY 139, 146–47 (1981) (noting the traumatic bond that can form between an abuser and the person being abused and that can lead to psychological dependence on the abuser); Lawrence A. Greenfield, et al., U.S. Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 167237, *Violence by Intimates: Analysis of Data on Crimes by Current or Former Spouse, Boyfriends, and Girlfriends* at v. (1998), *available at* www.ojp.usdoj. gov/bjs/pub/pdf/vi.pdf (noting that one of the "most common reasons given by victims for not contacting the police" was that they "feared retaliation"). In fact, mandatory arrest statutes, like the one passed in New York, were passed in many states in the 1980s and 1990s to address severe problems of recidivism and slow police response time to domestic violence calls. *See Town of Castle Rock v. Gonzales,* 545 U.S. 748, 779–81, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (Stevens, J., dissenting).

It requires no inferential leap, in light of what the officers must have known, for a reasonable factfinder to conclude that the officers' actions demonstrate a willful disregard of the obvious risks of a domestic violence situation, the serious implications of Okin's complaints over a fifteen-month period, and the likelihood that their misconduct would enhance the danger to Okin. *See Pena,* 432 F.3d at 114 (indicating that proof of "deliberate indifference" requires showing that the defendant "deliberately assumed or acquiesced in [the] risk" of unconstitutional conduct) (quotation marks omitted); *see also Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (explaining, in the Eighth Amendment context, that a government official acts with "deliberate indifference" when he or she "knows of and disregards an excessive risk"). For the reasons already discussed, the officers' conduct is not necessarily attributable to a failure to appreciate the gravity of the situation, and thus cannot definitively be characterized as mere negligence. Neither can the officers' conduct in this case be explained away by "the pull[ ] of competing obligations," *Lewis,* 523 U.S. at 853, 118 S.Ct. 1708, as there is no indication that "equally important governmental responsibilities," *id.* at 852, 118 S.Ct. 1708 (quotation marks omitted), could justify an investigation that instead of mitigating the violence, actually may have contributed to increasing the risk. A reasonable factfinder, therefore, could find that the officers' affirmative creation or enhancement of the danger to Okin was the product of deliberate indifference.

## C. Qualified Immunity

 **[10]**    Having determined that Okin raises a genuine issue of material fact as to whether defendants violated her rights under the Due Process Clause, we now turn to whether defendants are entitled to qualified immunity. Government actors are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  **\*433**  *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The principle of qualified immunity ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202, 121 S.Ct. 2151.

 **[11]**    **[12]**    **[13]**    A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted); *see also Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[T]he salient question ... is whether the state of the law [at the time of the incidents in question] gave respondents fair warning that their alleged treatment of [the victim] was unconstitutional."). The objective reasonableness test is met, and police officers will enjoy qualified immunity, if the question whether the officers would be violating rights is one on which "officers of reasonable competence could disagree." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity. [11] *See Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995).

[11]    Some cases frame the test as disjunctive: an officer "is entitled to qualified immunity if his conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for him to believe that his conduct did not violate such a right." *Gilles v. Repicky,* 511 F.3d 239, 246 (2d Cir.2007) (emphasis added). This would imply that an officer whose actions violated clearly established law might escape liability if he had an objectively reasonable belief that his conduct did not violate the clearly established law. However, *Saucier* makes it clear that the "objectively reasonable" inquiry is part of the "clearly established" inquiry. 533 U.S. at 202, 121 S.Ct. 2151; *see also Pearson,* 129 S.Ct. at 822, 129 S.Ct. 808 (noting that the inquiry turns on "the objective reasonableness of the action taken, assessed in light of the rules that were clearly established at the time it was taken"). Thus, once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful. This is so because a police officer who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful. We clarify here that the two are part of the same inquiry, not independent elements as some cases suggested.

 **[14]**    **[15]**    We look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right. *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004). And, while it is clear that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision," *see Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), we may examine statutory or administrative provisions in conjunction with  **\*434**  prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights, *see Hope,* 536 U.S. at 741–45, 122 S.Ct. 2508 (finding that in light of binding circuit precedent, applicable state regulations, a Department of Justice report informing the state's department of corrections of the "constitutional infirmity" of handcuffing an inmate to a hitching post, and the "obvious cruelty inherent" in the practice, respondents had "fair and clear warning" that use of the hitching post in that case violated the victim's constitutional rights).

The issue in this case is whether defendants were on notice that their affirmative interactions with an individual accused of domestic violence, their failure to arrest the accused individual, and their disregard of established procedures for responding to domestic violence incidents, which were reasonably likely to encourage the accused individual to believe that he would not be arrested, punished, or otherwise interfered with while engaging in domestic violence, would contribute to the vulnerability of the complainant by emboldening her abuser, thereby giving rise to a substantive due process violation. *Dwares* gave notice of the rule that a police officer can violate a person's due process rights by affirmatively creating or increasing the risk of private violence against that person. 985 F.2d at 99. Viewing the evidence in favor of Okin, defendants engaged in a pattern of behavior that unmistakably communicated to Sears that should he intend to commit acts of violence against Okin, they would do nothing to stop him. This behavior is similar to that which gave rise to actionable due process claims in *Dwares,* the only difference being that the officers in *Dwares* explicitly told the skinheads that their violence would not be stopped, whereas the officers here implicitly communicated to Sears that domestic violence against Okin would go unpunished. We do not see this difference to undermine the critical fact, again viewing the evidence favorably to Okin, that the officers were fully aware that private actors intended to commit *intentional* violence. Sears told Williams that he could not "help it sometimes when he smacks Michele Okin around," and the officers gave official sanction to that violence.

In *Hemphill,* the officers handed a gun to a store manager who had just been robbed and invited the manager to accompany them in pursuit of the suspect, who was then shot by the store manager during the pursuit. 141 F.3d at 418. The officers never told the store manager to shoot the suspect, but in handing over the gun, they implicitly communicated that the manager's subsequent use of the gun would be officially sanctioned. *Id.* at 419. This was the actionable substantive due process violation in *Hemphill.* Okin similarly alleges that the officers implicitly but affirmatively communicated to Sears that he could persist in intentional violence against her without threat of punishment. The officers did not give Sears a weapon, but that is of no moment. Their behavior, as in *Hemphill,* created the conditions for Sears to visit *intentional* violence upon Okin, unimpeded.

 [16]    We therefore find that the state-created danger theory, at the time of defendants' actions here, clearly established that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply. Together, *Dwares* and *Hemphill* stand for the proposition that police officers may not engage in conduct that encourages or condones a private actor's infliction of intentional violence. *Dwares, Hemphill*, and Okin's case  **\*435**  may show that affirmative police conduct runs along of spectrum of explicit and implicit actions, but the critical fact remains—these cases all involve affirmative police conduct that encourages, condones, or facilitates the infliction of intentional violence. *See Hope,* 536 U.S. at 741, 122 S.Ct. 2508 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The prohibition on official sanction of intentional violence applies equally in each case, and provided the officers here with notice that their conduct would be unlawful.

At first glance, this case also appears similar to *Pena,* where as noted above, we found that the application of *Dwares* in the context of that case was not clearly established at the time of defendants' actions, so that under principles of qualified immunity the defendants could not be held individually liable. *Pena,* 432 F.3d at 102, 114–15. *Pena* read *Dwares* to provide that officials may be liable under Section 1983 for approving the "misconduct" of private actors "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. The issue in *Pena* was whether it would have been clear to reasonable officers, after *Dwares,* but before *Pena* itself was decided, that they would violate a victim's constitutional rights by participating in, or generally condoning, an officer's reckless drunk driving, with the result that the officer's drunk driving caused fatalities. In finding that the principle of qualified immunity precluded liability, the court wrote:

> Although it is a close question, we think that the substantive due process violation that the plaintiffs allege here was not clearly established for purposes of qualified immunity. *Dwares* did not address, let alone decide, whether repeated inaction on the part of government officials over a long period of time without an explicit statement of approval, might effectively constitute such an implicit "prior assurance" that it rises to the level of an affirmative act. *Dwares* also did not indicate whether government officials

may implicitly send a message of official sanction by engaging in related misconduct themselves or by participating in or tolerating such a practice.

*Pena,* 432 F.3d at 115.

The district court, while persuaded that *Pena* was controlling in Okin's case on the question of qualified immunity, read *Pena* too broadly. [12] In *Pena,* the officers sent the message to their off-duty colleague that he could be *reckless* in driving while intoxicated, and "engag[e] in misconduct that is likely to endanger the life, liberty or property of others." *Pena,* 432 F.3d at 111. Here, by contrast, Okin seeks to show that the officers—in the course of their official duties while responding to her domestic violence complaints—sent the message that Sears was free to engage in **\*436** *intentional* violence. The official sanction of *intentional* violence was the precise message conveyed by the officers acting pursuant to their official duties in *Dwares,* 985 F.2d at 99, and in *Hemphill,* 141 F.3d at 419.

[12]    The court reasoned as follows:
> As for the implicit facilitation theory adopted by the Court of Appeals in *Pena*: the facts of this case are in many ways closer to those of *Pena,* where defendant police officers had implicitly assured one of their own that he could drink and drive with impunity, through a culture in which police officers were "encouraged to inappropriately drink alcohol while on and off-duty," and supervising officers routinely promoted such behavior and participated in it. *Pena,* 432 F.3d at 111. But plaintiff cannot rely on *Pena* because the events in suit preceded the *Pena* decision by over two years. For that reason, the individual defendants here —just like the individual defendants in *Pena*—would be entitled to qualified immunity, even if they implicitly facilitated Sears' abuse by not arresting him or closing out Okin's numerous complaints almost as soon as they were opened.
> *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*48–49, 2006 WL 2997296, at \*17.

While *Pena* contains several broad statements regarding what *Dwares* did or did not decide, we are obligated to read those statements "in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. *Pena* correctly observed that *Dwares* did not provide an implicit sanction theory where police officers encouraged *reckless* violence. 432 F.3d at 114. But the statements in *Pena* regarding *Dwares* do not extend to Okin's case where police officers encouraged *intentional* violence. We draw support for this conclusion from our discussion above of cases that involved official sanction of intentional violence, and from the *Pena* court's explicit acknowledgment that the question of qualified immunity, where that case involved official sanction of *reckless* violence, was a "close" one, 432 F.3d at 115. As the officers in *Pena* encouraged reckless drunk driving, *Pena* is distinguishable from *Dwares, Hemphill,* and this case. The officers here, as in *Dwares* and *Hemphill,* affirmatively conveyed to Sears that he had carte blanche to perpetrate intentional violence against Okin. The officers had notice not only of the general prohibition on dangers created by state actors' affirmative conduct, but also, that their conduct, to the extent it implicitly encouraged intentional violence, specifically, could fall within the realm of that prohibition. *See Hope,* 536 U.S. at 741, 122 S.Ct. 2508 (explaining that " 'general statements of the law'," while they may not indicate the universe of unlawful conduct, " 'are not inherently incapable of giving fair and clear warning' " because " 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question' ") (quoting *United States v. Lanier,* 520 U.S. 259, 270–71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

We cannot accept that an "officer of reasonable competence," *Lennon,* 66 F.3d at 420, would fail to understand, following *Dwares* and *Hemphill,* that discussing football scores with Sears after Okin's complaints that he had beaten and tried to choke her, repeatedly failing to interview or arrest Sears, or to file domestic incident reports, despite Okin's numerous complaints of abuse and statements of fear for her life, and Sears informing Chief Williams that he could not "help it sometimes when he smacks Michele Okin around," would affirmatively communicate to Sears that he could continue to beat and threaten Okin without fear of police intervention, and would contribute to the vulnerability of the complainant by emboldening her abuser. Unlike the officers in *Pena* that encouraged reckless off-duty behavior, the officers in Okin's case, as in *Dwares* and *Hemphill,* were, in the course of their official duties, encouraging intentional violence by a private actor. The investigation of domestic violence complaints are, and were at the time of the events alleged by Okin, well-known to defendant police officers through extensive professional training in that area, including state law governing those investigations. [13]   **\*437**  *See Hope,* 536 U.S. at 738, 122 S.Ct. 2508 ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.").

13    The officers' depositions indicate that all the individual defendants received training in domestic violence issues. Further, the officers employed by the Village would have been aware from its Police Department Manual that they must "consider domestic violence as [criminal] conduct that shall be investigated, as would be any other offense" and that "[d]ispute mediation will *not* be used as a substitute for appropriate criminal proceedings in domestic violence cases." They may also be charged with knowledge of the New York law, first adopted in 1994, that arrest is mandatory in a domestic violence situation unless the violence is a family offense misdemeanor *and* the victim requests that the perpetrator not be arrested. *See* N.Y.Crim. Proc. L. § 140.10(4).

The officers' failure to comply with their training and the relevant state law, provides strong support for the conclusion that the officers should have been aware of the wrongful character of their conduct. [14] *See id.* at 744, 122 S.Ct. 2508 (explaining that the defendants' course of conduct, which tended to prove that the defendants ignored a regulation that restricted the use of hitching posts, provided "strong support for the conclusion that [defendants] were fully aware of the wrongful character of their conduct").

14    *Pena* also observed that "*Dwares* did not expressly address the question of the scienter required for section 1983 liability." *Pena,* 432 F.3d at 115. That *Dwares* does not discuss the "shocks the conscience" standard, however, does not establish qualified immunity. It is well-settled that police conduct arising from deliberate indifference can shock the conscience when officers "hav[e] time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Lewis,* 523 U.S. at 853, 118 S.Ct. 1708. Because police response to domestic violence complaints, where officers are trained and legally obligated to investigate those complaints, is a course of conduct where "actual deliberation is practical," *id.* at 851, 118 S.Ct. 1708, the officers here were on notice, that implicitly but affirmatively creating a risk of intentional violence against Okin while performing their official duties, with reckless disregard for her safety, would be unlawful.

In sum, the rule drawn from *Dwares,* although its application was not clearly established under the circumstances in *Pena,* applied with "obvious clarity" to Okin's case. *Id.* at 741, 122 S.Ct. 2508 (quotation marks omitted). Hence, we find that the actions taken by the officers in response to Okin's complaints clearly implicated the exception to *DeShaney* that we have repeatedly upheld—where "the officer in some way had assisted in creating or increasing the danger to the victim," the officer's actions implicated the victim's rights under the Due Process Clause. *Dwares,* 985 F.2d at 99; *see also Hemphill,* 141 F.3d at 419. [15] We conclude that the state of the law in 2001 to 2003 gave defendants fair warning that police conduct that encourages a private citizen to engage in domestic violence, by fostering the belief that his intentionally violent behavior will not be confronted by arrest, punishment, or police interference, gives rise to a substantive due process violation, and that defendants, if found liable, would not be entitled to qualified immunity. We therefore reverse the district court's dismissal of Okin's due process claims as to Douglas, Lug, Weber and Williams. On extensive review of the record, we find that Okin does not raise a genuine issue of material fact as to repeated failures, of a kind that would have emboldened Sears, on the part of defendants Rusty O'Dell and Edward Manion, and we affirm the grant of summary judgment to them.

15    We also note that in *Dwares,* we cited an Eighth Circuit case, *Freeman v. Ferguson,* 911 F.2d 52 (8th Cir.1990), which had facts similar to those in this case, to support our finding that "an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would" implicate the victim's rights under the Due Process Clause. *Dwares,* 985 F.2d at 99. In *Freeman,* a police chief instructed subordinates to ignore the victim's pleas for protection from her husband, who was the chief's friend, and the Eighth Circuit remanded the case for repleading on the theory that the officers affirmatively increased the danger decedent faced. *See* 911 F.2d at 54–55.

**\*438  II. Okin's Equal Protection Claims**

 [17]    Okin alleges that, by their failure to apply the law equally on the basis of gender and their failure to discharge their duties in a non-discriminatory manner, defendants violated her equal protection rights. Her claim is that, although the defendant police departments' stated policy was that domestic violence incidents were to receive the same police attention as other criminal incidents, their unspoken policy and practice was to treat complaints of domestic violence towards women differently.

 [18]    Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause. *See Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In *Eagleston v.*

*Guido,* 41 F.3d 865 (2d Cir.1994), a directed verdict case, we announced a standard for equal protection claims in the domestic violence context, writing that a directed verdict is appropriate "unless the plaintiff adduces evidence sufficient to sustain the inference that there is a policy or a practice of affording less protection to victims of domestic violence than to other victims of violence in comparable circumstances, that discrimination against one sex was a motivating factor, and that the policy or practice was the proximate cause of plaintiff's injury." *Id.* at 878.

In *Eagleston,* a woman contacted the police ten times to report harassment and threats by her sporadically estranged husband; the two had orders of protection against each other. *Id.* at 868. On only one occasion was he arrested. Eventually, the woman was stabbed by the husband 30 or more times with a carving knife, following an argument. *Id.* Her complaint charged that "defendant, County of Suffolk, acting through its police department, condoned a pattern [or] practice of affording inadequate protection, or no protection at all, to women who have complained of having been abused by their husbands or others with whom they have a close relationship." *Id.* at 868 (alteration in original). As Judge Jacobs wrote

> Accepting Mrs. Eagleston's account as true, her testimony showed at most ... that a few police officers failed to perform their jobs well. Her testimony does not evidence a department-wide practice of disparate treatment for domestic disputes. Even on the level of anecdote, Mrs. Eagleston's account is fully consistent with a responsive police department dealing on an incident-by-incident basis with an ambiguous series of events.

*Eagleston,* 41 F.3d at 876.

As the district court noted here, under *Eagleston,* domestic violence plaintiffs must "adduce some evidence that officers responded differently to [non-domestic] types of complaints in order to prevail on an equal protection claim." *Okin,* 2006 U.S. Dist. LEXIS 75881, at *58, 2006 WL 2997296, at *20. To prevail, Okin would have to demonstrate that her complaints of domestic violence were treated differently than other, similar complaints of violence, because of her gender. Although, pursuant to *Eagleston,* 41 F.3d at 878, Okin must sustain the inference that victims of comparable *non*-domestic violence were afforded more protection, she does not attempt to show that police officers responded with more competence, say, or a higher rate of arrest, to complaints of violence that were not domestic in nature. As the district court put it, "[s]he relies exclusively on her own story—which, while heartrending, does not get her where *Eagleston* says she must go." *Okin,* 2006 U.S. Dist. LEXIS 75881, at *58, 2006 WL 2997296, at *21.

Okin asks us to repudiate *Eagleston,* arguing that repeated deviations from the mandatory arrest statute and from corresponding **\*439** police department policy, even with respect to only one female domestic violence victim, could be grounds for an inference of gender bias, that is, that a woman who is a victim of domestic violence should not need to prove that a police department afforded her less protection than it did victims of non-domestic violence in comparable circumstances. We decline, however, to revisit *Eagleston.*

Any equal protection claim is grounded on a comparison between the treatment the state gives similarly situated individuals. Okin could have attempted to show that she *and other women* were discriminated against by defendant police departments but, although defendants produced in discovery police reports concerning domestic violence response in Cornwall, Okin has not attempted to demonstrate discrimination by a comparison based upon these. Failing that, at the very least she has to show that it was her gender, and not some other characteristic, that motivated the treatment she received. She might be able to do this if she had compared evidence of the manner in which defendant police departments responded to comparable non-domestic violence incidents, with the manner in which they responded to domestic violence at her house, but again she does not attempt such a comparison.

We therefore hold that the district court correctly concluded that Okin failed to raise a genuine and material dispute of fact concerning whether defendants denied her equal protection of the law, and we affirm that part of the district court's order which granted, as to all moving defendants, summary judgment on Okin's claim for violation of her right to equal protection under the Fourteenth Amendment.

### III. Municipal Liability

 **[19]**    In her complaint, Okin alleges that not only the individual defendants, but also the police departments by which they were employed, violated her due process and equal protection rights. Section 1983 "imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell v. Dep't. of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (quoting 42 U.S.C. § 1983). "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006). Having found that Okin raises a genuine issue of material fact as to whether the individual defendants of the Village of Cornwall–on–Hudson violated her due process rights, we now consider the question whether she raises a genuine issue of fact as to the municipal liability of the Village.

 **[20]**    A municipality may be found to have a custom that causes a constitutional violation when "faced with a pattern of misconduct[, it] does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007); *see also Sorlucco v. New York City Police Dep't.,* 971 F.2d 864, 871 (2d Cir.1992) (municipal liability can be established "by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the constructive acquiescence of senior policymakers"); *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir.1991) (finding that "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it").

 **[21]**    Okin's claim of municipal liability, although focused on the Village's alleged  **\*440**  failure-to-train, is fairly construed to articulate a claim that the Village had a custom whereby it acquiesced in unconstitutional conduct by its officers. The record shows more than a dozen contacts between Okin and the Village, that involved a number of officers, including high-ranking officials like Sergeant Weber and Captain Williams, and that recurrently concerned complaints of domestic violence. These incidents suggest a consistent pattern of failing to adequately respond to Okin's complaints, to implement the New York mandatory arrest statute, to interview the alleged abuser, or to file domestic incident reports, a pattern which may have encouraged further violence. We therefore find sufficient evidence in the record to create a genuine issue of fact as to whether the officers' conduct indicates a practice, tacitly endorsed by the Village, that "was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law.' " *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir.2004) (quoting *Sorlucco,* 971 F.2d at 870–71).

 **[22]**    Municipal liability may also be premised on a failure to train employees when inadequate training "reflects deliberate indifference to ... constitutional rights." *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To prove deliberate indifference, we have required the plaintiff to show: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992).

We have no trouble in finding that policymakers would know that officers will confront domestic violence situations, that training assists officers to employ criminal justice strategies attuned to the complexities of domestic violence, and that in Okin's case, the record indicates a history of mishandling her complaints. There is also a strong likelihood that the officers' repeated failures to meaningfully respond to Okin, potentially enhancing the risk of violence, qualifies as a pattern of misconduct that would frequently cause violations of a citizen's constitutional rights and that suggests training so inadequate as to give rise to an inference of deliberate indifference. *See Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995) ("[D]eliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.") Okin thus meets the *Walker* requirements at this stage.

 **[23]** **[24]** A closer question is whether Okin, in order to proceed beyond summary judgment on the failure-to-train theory, has "identif[ied] a specific deficiency in the city's training program and establish[ed] that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Green v. City of New York,* 465 F.3d 65, 81 (2d Cir.2006) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004)). A pattern of misconduct, while perhaps suggestive of inadequate training, is not enough to create a triable issue of fact on a failure-to-train theory. *See Amnesty Am.,* 361 F.3d at 130. The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not "[t]hat a particular officer may be unsatisfactorily trained" or that "an otherwise sound program has occasionally been negligently administered," **\*441** and that a "hypothetically well-trained officer" would have avoided the constitutional violation. *City of Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197; *see also Amnesty Am.,* 361 F.3d at 129–30.

The district court noted that, but for finding no triable issue of fact on Okin's constitutional claims, it would have found the "individual officers' sketchy recollection and understanding of domestic violence laws and policies, together with their pattern of not taking Okin's repeated complaints seriously, at the very least [to] raise[ ] an issue of fact concerning the adequacy of the training provided by the two Departments to their officers." *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*69, 2006 WL 2997296, at \*24. We agree with the district court's observation that the record shows more than a pattern of misconduct. Because some of the officers were unable during their depositions to remember basic details regarding their training on domestic violence, a reasonable factfinder could plausibly infer that the training program failed to impart with the necessary frequency or specificity how to appropriately respond to domestic violence complaints, including the circumstances that call for interviewing suspects and witnesses, filing domestic incident reports, and making an arrest. It is questionable whether evidence of the officers' inability to recall the substance of their training could alone create a triable issue of fact on the adequacy of a training program. *See City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197. The record in this case is not so limited, however.

Here, Captain Williams testified that, along with Sergeant Weber, he was involved, at least in part, in administering the Village's training program on domestic violence, having led a refresher course on domestic violence in 2002. We have seen that the evidence, viewed favorably to Okin, shows that Sears told Williams he abused Okin and that Weber was continually dismissive in response to Okin's complaints. The repeated failure of high-ranking officers to properly respond to domestic violence complaints, when those same officers were responsible for teaching subordinates how to respond domestic violence, suggests a fundamental flaw in the training program—placing training responsibility in the hands of those who may themselves not understand the problem or the appropriate response. The pattern of misconduct and the lower-ranking officer's "sketchy recollection and understanding of domestic violence laws and policies," *Okin,* 2006 U.S. Dist. LEXIS 75881, at \*69, 2006 WL 2997296, at \*24, could reasonably be viewed as the product of inadequate teaching by higher-ranking officers who were not trained to train, rather than the isolated shortcomings of individual officers. We therefore conclude, although the question is close, that Okin offers evidence of a specific training deficiency and that, but for this deficiency, the alleged violations could have been avoided.

Okin raises a genuine issue of material fact as to whether the Village of Cornwall-on-Hudson is subject to municipal liability on both theories of an unconstitutional custom and a failure to train. We therefore reverse the district court's ruling on municipal liability with respect to Village of Cornwall–on–Hudson. [16] We affirm the **\*442** district court's dismissal of Okin's municipal liability claims as to the Town of Cornwall.

[16]   Because we have held that the due process rights that Okin alleges were violated were "clearly established" at the time of the events in question, we have no occasion to decide whether Okin's municipal liability claims are governed by *Young v. County of Fulton,* 160 F.3d 899, 904 (2d Cir.1998) (stating that "a claim for failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right"), or by *Tenenbaum v. Williams,* 193 F.3d 581, 597, 605 (2d Cir.1999) (vacating grant of summary judgment and remanding for ruling on claims against municipality even though individual defendants were entitled to qualified immunity because constitutional right allegedly violated was not clearly established at time in question).

## CONCLUSION

For the foregoing reasons, we REVERSE in part the district court's dismissal of Okin's Section 1983 claims for violation of the right to due process under the Fourteenth Amendment, affirming only the grant of summary judgment as to defendants Town of Cornwall, Rusty O'Dell and Edward Manion; we AFFIRM the district court's dismissal of Okin's Section 1983 claims for violation of the right to equal protection under the Fourteenth Amendment; we REVERSE the district court's dismissal of Okin's municipal liability claims; and we REMAND for proceedings consistent with this opinion.

**All Citations**

577 F.3d 415

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---